[No. 26666.   Department Two.   October 6, 1937.]

L. J. DOWELL, INC., *Appellant*, v. UNITED PACIFIC
CASUALTY INSURANCE COMPANY, *Respondent*.[1]

[1]Reported in 72 P. (2d) 296.

*J. Speed Smith* and *Henry Elliott, Jr.*, for appellant.
*Ballinger, Hutson & Boldt*, for respondent.

HOLCOMB, J.—Most of the material facts were stipulated by the parties. The facts are these: On April 3, 1934, for and in consideration of the agreement of appellant to pay a certain premium in the sum of $449.02, respondent made, executed, and delivered to appellant respondent's master policy of automobile liability insurance No. W-111260 upon its regular printed forms of insurance, and this policy was in full force and effect on June 15, 1934. On or about March 20, 1934, appellant executed a written application to the state department of public works on a printed form S. F. No. 377, furnished for the issuance by the department to appellant of a for-hire permit, and the same was filed with the department on March 22, 1934.

On April 3, 1934, upon application by appellant and the payment of an additional premium of five dollars, respondent executed upon forms prepared by it, a supplemental policy of automobile liability insurance, No. 111260A. This policy was transmitted by respondent to the state department of public works to be filed in support of the written application for a for-hire permit pursuant to the existing state laws and statutes and the rules and regulations theretofore promulgated by that department.

On May 31, 1934, that department entered its order M. V. No. 10674, granting the application of appellant to operate as a for-hire carrier and, on June 12, 1934, transmitted to appellant at Seattle, permit No. F. H. 920, which continued in force and effect on June 15, 1934, the date of the accident in question.

On January 30, 1934, appellant entered into a contract with the state of Washington (hereafter designated as the Snohomish county highway contract), wherein appellant agreed to do all work and furnish all tools, materials and equipment for

"Clearing, grading, draining, surfacing with crushed stone and constructing a pile and timber overcrossing trestle, Everett City Limits—Broadway Street South—Extension in Snohomish County, Washington, between station 0+00 and station 128+57.8"

in accordance with plans and specifications attached to this contract. The contract also provided for the acquisition of gravel from certain described pit sites.

Prior to, on and subsequent to June 15, 1934, appellant was engaged in transporting gravel from one of the pit locations to the site of the work, the state having purchased the right to take gravel from the pit in question. Appellant used automobile trucks in performing this work and used a steam shovel at the gravel pit to load the gravel onto the trucks. Upon being loaded, the trucks were driven by the operators to the portion of the highway covered by the contract, and the gravel was dumped wherever needed.

As the work continued, it became necessary for appellant to add to the number of trucks to keep the gravel moving from the pit, to prevent the steam shovel and its crew from being idle at intervals. Hence, on the afternoon of June 14, 1934, appellant procured from H. O. Seiffert Company, a corporation, at Everett, a White automobile truck, bearing serial No. 174940 and motor number 3A1565, together with a driver thereof, to assist in hauling gravel from the pit to the highway. This truck will hereafter be referred to as the Seiffert truck. It was procured under an oral agreement between appellant and the owner, H. O. Seiffert Company, whereby the owner agreed to send

the truck and the driver to the work, and to haul gravel from the pit to the highway under improvement, and appellant agreed to pay for the use of the truck and driver three dollars per hour.

It is noteworthy that, on February 28, 1934, American Automobile Fire Insurance Company and American Automobile Insurance Company issued to H. O. Seiffert Company their joint policy of automobile insurance covering the Seiffert truck, the coverages including property damage in an amount of one thousand dollars or more, and public liability assumed by the American Automobile Insurance Company, the limits of liability on public liability contained in the policy being in excess of five thousand dollars for any recovery for personal injury to or death of one person, and in excess of ten thousand dollars for any recovery for injury to or death of all persons as the result of one accident, which policy was in full force and effect prior to, on and after June 15, 1934.

The driver was placed upon appellant's payroll and reported by appellant to the state department of labor and industries as an employee of appellant. Pursuant to appellant's instructions, this driver and truck took their regular place in appellant's fleet of automobile trucks and secured from appellant's steam shovel a load of gravel, which was transported to the site of the work and dumped there, and thereafter the truck and driver continued to work in that manner.

The schedule of insurance included in appellant's policy described a 1924 White 5-ton truck bearing Waukeshau motor number 348871. This truck was owned by appellant and was known as truck No. 14. It was hauling gravel on the Snohomish county highway contract on the morning and afternoon shifts of June 13 and 14, 1934. It appears that, in the evening of June 14th, it was taken off of this job and was sent

to South Bend, Washington, to haul some heavy machinery, and that it was engaged in this latter work on June 15th. The Seiffert truck which was involved in the accident came on the Snohomish county job on June 14th and continued on the work hauling gravel up to the time of the accident on June 15th.

In passing to and from the gravel pit, it was necessary for the trucks to travel along a public highway known as the M & R road. On June 15, 1934, after this truck had delivered a load of gravel at the site of the contract work, and while it was being returned to the gravel pit for the purpose of hauling another load of gravel to the site, and while being driven in a southerly direction on the M & R road, the front end of the truck ran into and collided with a Dodge sedan automobile belonging to Charles Lindblom and Kathryn Lindblom, his wife, then being operated and driven by Kathryn Lindblom in an easterly direction on the Fair Grounds road, in Snohomish county, a public highway, intersecting with the M & R road at right angles; and as a result of this collision, the Dodge sedan automobile was badly damaged, and Kathryn Lindblom, who was riding therein and operating the automobile, Anna E. Gilmore, Olivia Burpee and Iola Burke, who were passengers riding in this automobile, each sustained very severe and serious personal injuries.

The truck was being operated at a speed in excess of fifteen miles per hour at the time of the collision at the public highway intersection, and the lawful speed limit for the truck at the time and place was fifteen miles per hour.

Thereafter, four actions were instituted by the injured parties to recover for personal injuries and property damage, resulting from the alleged negligence of defendants. On about February 15, 1935,

Charles Lindblom and Kathryn Lindblom, his wife, commenced in the superior court of Washington for Snohomish county, a law action against H. O. Seiffert Company and L. J. Dowell, Inc., wherein they sued to recover against defendants and each of them the sum of $3,427, and costs and disbursements therein. On about February 25, 1935, A. R. Gilmore and Anna E. Gilmore, his wife, commenced in the superior court of Washington for King county, a law action against H. O. Seiffert Company and L. J. Dowell, Inc., to recover judgment against defendants and each of them for $23,785, and costs and disbursements therein. On about May 14, 1935, Olivia Burpee commenced an action in the superior court for King county against H. O. Seiffert Company and L. J. Dowell, Inc., to recover against defendants and each of them the sum of $10,750.25 and costs and disbursements therein. On about May 14, 1935, Vernon A. Burke and Iola Burke, his wife, commenced an action in the superior court for King county against H. O. Seiffert Company and L. J. Dowell, Inc., to recover against defendants and each of them the sum of $36,859.25 and for their costs and disbursements.

On May 17, 1935, appellant herein, through its attorney, advised respondent of these actions and tendered the defense of these suits. Respondent disclaimed all liability in connection therewith. Appellant, upon advice of its counsel, and after making a full and complete investigation, concluded there was probably legal liability upon its part as defendant in these actions, and, being desirous of limiting its legal liability, did, through negotiations with its co-defendant and the plaintiffs in these actions, before trial of the causes and without judgment being entered therein, effect a compromise and settlement of each of these causes of action by payment of the following

sums, to-wit: Charles Lindblom and Kathryn Lindblom, $1,569.50; Olivia Burpee, $3,025.25; Vernon A. Burke and Iola Burke, $11,405.25; and A. R. Gilmore and Anna E. Gilmore, $4,000. Appellant contributed toward this compromise settlement one-half to each of those sums.

H. O. Seiffert Company tendered its defense of these actions to the American Automobile Insurance Company under its liability policy issued to it, which insurance company assumed the defense of these actions upon behalf of the assured, conducted the negotiations for settlements, and consummated settlements of these causes of action by paying from the funds of the insurance company the other half of the above mentioned sums paid to respondent.

From the record, it appears that, in making the compromises and settlements, appellant acted in good faith and with reasonable care and prudence under the circumstances. In its defense of the actions and in conducting an investigation of the facts and circumstances surrounding the accident, and the questions of liability connected therewith, appellant expended $174.25, and the further sum of $1,000 as attorney's fees, and $103 in payment of necessary incidental expenses, the costs of taking depositions, and court costs.

Considering now the policy issued by respondent to appellant, the truck named in the policy was a 1924 White 5-ton truck, Waukeshau number 348871.

The policy provides that respondent:

"Hereby agrees with the assured named in the schedule of insurance forming a part hereof in respect of fire and transportation, theft, collision; bodily injuries or death resulting therefrom; property damage; accidentally sustained during the term of this policy by reason of the ownership or maintenance of any of

the automobiles described in the within schedule of insurance and the use thereof for the purposes therein set out as follows:"

"Section V. To pay within the limit specified in the schedule of insurance, any loss by reason of liability imposed by law upon the assured, including loss arising from loading and unloading such automobiles, for bodily injuries or death at any time resulting therefrom. . . ."

"Section VI. To pay within the limits specified in the schedule of insurance, any loss by reason of liability imposed by law upon the assured, including loss arising from loading and unloading such automobiles, for property damage (excluding property of the assured or in his custody, or property carried in or upon any of the described automobiles), including loss of use of such property."

Section C provides:

"In the event of accident, immediate written notice thereof shall be given the company at its home office in Seattle, Washington, or to one of its duly authorized agents, with particulars sufficient to identify the assured, and like notice of any claim or suit arising or resulting therefrom, with every summons or other process served therein. . . ."

The schedule of insurance in the master policy contained the following items germane to the questions presented:

"ITEM
"1. Name of Assured L. J. DOWELL, INC.,

. . . . . . . . . . .

"3. Occupation or Business PAVING CONTRACTOR

. . . . . . . . . . .

"5. INSURANCE UNDER ANY SECTION OF THE POLICY FOR WHICH THE AGREED PREMIUM CHARGE HAS NOT BEEN ENTERED BELOW IS VOID.
"Sections                                    Premium

. . . . . . .. . . .

"V.  PUBLIC LIABILITY:
 "Limit any one person. .Dollars ($25,000.00) }$143.51
 "Limit any one accident Dollars ($50,000.00) }

"VI. PROPERTY DAMAGE Limit any one
accident ..............Dollars ( 5,000.00) $81.00
(Including loss of use)
"VII. OTHER COVERAGE TRAILER (PL 143.51-PD
81.00) ................................. $224.51
"TOTAL PREMIUM .................. $449.02

### "WARRANTIES

"The following are statements of facts known to and warranted by the Assured to be true, and this policy is issued by the Company relying on the truth thereof:

"6. The following is the description of the automobile:

| Year | Model | Trade Name | Capacity | Type of Body |
|------|-------|-----------|----------|--------------|
| 1924 |       | WHITE      | 5 TON    | TRUCK        |

"Factory No.      Motor No.
                WAUKESHAU
                No. 348871

. . . . . . . . . .

"8. The described automobile is and will be used for COMMERCIAL PURPOSES.

"If the use is for PLEASURE AND BUSINESS or for COMMERCIAL PURPOSES it shall be understood as defined below in (a) and (b) respectively. . . .

"(b) The term COMMERCIAL PURPOSES is defined as the transportation or delivery of goods in direct connection with the Assured's business occupation as stated above, by automobiles of the truck or delivery type and by automobiles of the private passenger type which have been altered and designed for such purposes, but excluding the carrying of passengers for a consideration, expressed or implied, demonstrating, testing, or the towing of any trailer by either of the aforementioned types, unless such trailer is identified and described herein, and additional premium is charged for it; and in the event the policy is so extended, coverage not to include the carrying of passengers."

The schedule recited in the supplemental policy provided for statutory coverage on public liability and property damage.

On February 2, 1934, the state department of public

works, division of transportation, issued its general order, MV No. 48, whereby it promulgated:

"Rules and Regulations governing motor freight carriers operating under certificates of public convenience and necessity and contract hauler and for hire permits as provided in chapter 166 of the Laws of 1933, as amended by chapter 55 of the Laws of Extraordinary Session of 1933."

Endorsement No. 1 on the policy is in the form prescribed by rule 35 of the "Laws, Rules and Regulations governing Motor Freight Carriers operating under Certificates or Permits" issued by the state department of public works, pursuant to chapter 166, Laws of 1933, p. 613, as amended by chapter 55 of the Laws of 1933, Ex. Ses., p. 138.

The endorsements attached to the policy, which are material to this case, are these:

Attached to the policy, and constituting a part thereof at the time the policy was issued, is endorsement No. 1, which provides, *inter alia:*

"*In consideration of the premium stated in the policy to which this endorsement is attached, the company agrees to cover, in addition to the motor vehicle and/or* trailers named in the policy, *any additional emergency or substituted motor vehicles and/or trailers for a period of ten days from the date of beginning of use of such equipment, without such equipment being added by endorsement;* Provided, however, that such automatic coverage shall cease after the ten days coverage unless the company is notified, and proper coverage provided. . . ." (Italics ours.)

"The policy to which this endorsement is attached is written in pursuance of, and is to be construed in accordance with Chapter 166, Laws of 1933, as amended by Chapter 55, Laws of the Extraordinary Session of 1933 of the state of Washington, and acts amendatory thereof and supplemental thereto and the rules and regulations of the department of public works of Washington adopted thereunder. The policy

is to be filed with the state in accordance with said statute."

Attached to the policy, and constituting a part thereof at the time the policy was issued, is endorsement No. 2, which provides:

"It is hereby understood and agreed by and between the company and the assured that the policy to which this endorsement is attached shall be subject to the following Special Conditions and Limitations, to-wit:

"That in order to comply with the requirements of the laws of THE STATE OF WASHINGTON relating to Public Carriers, the Company has filed with THE DEPARTMENT OF PUBLIC WORKS supplemental policy containing such terms, conditions and limitations of Liability as are required by the Laws of SAID STATE and the rules and regulations of said department appurtenant thereunto. It is expressly understood and agreed that the filing of such supplemental policy shall not increase or shall not be construed as increasing the limits of Liability of the Company over and above the limits set forth in the policy to which this endorsement is attached, and that as between the Company and the Assured, *the policy to which this endorsement is attached shall be considered as the real or true contract between the parties and that the limits of Liability therein set forth represent the total or gross Liability of the Company.*

"All terms and conditions of the policy to which this endorsement is attached remain unchanged except as herein specifically provided." (Italics ours.)

The policy bears this execution clause, including the signatures of its officers and countersigning agent:

"IN WITNESS WHEREOF, this Company has executed and attested these presents; but this policy shall not be valid unless countersigned by a duly authorized agent of the Company.

Chas. T. Hutson, Secretary. J. W. Reynolds, President.

"Countersigned at SEATTLE, WASHINGTON, this 3rd day of APRIL, 1934.

"WESTERN INSURANCE BROKERS, INC.
"By J. H. Thomas, Jr., Agent."

The trial court held appellant could take nothing in this action, and that respondent recover its costs and disbursements. From that judgment, appellant appeals and makes the following assignments of error: That the court erred (1) in making finding 21, (2) in making its conclusion of law, (3) in rendering judgment against appellant, and (4) in rendering judgment in favor of respondent.

The questions presented are many and varied.

Finding 21 is:

"That plaintiff wholly failed to give written or other notice of the accident referred to herein to defendant, or any of its agents, and defendant had no knowledge thereof until about the first day of January, 1935."

In his decision, the trial court said:

"The burden is upon the plaintiff to establish that notice by a fair preponderance of the evidence. As a question of law I agree with Mr. Boldt's contention that on that phase of the case the plaintiff must stand or fall upon the findings of the court as to whether or not the witness Thomas' testimony is to be accepted by the court.

"As Mr. Boldt has pointed out, the whole effect of an attempt to waive the provisions of the policy rests upon the rule of estoppel, and I am satisfied that whatever reasonable leeway was allowed in the time for giving notice, it could not be extended to cover such notice as was given some six months after the accident, and that therefore if it is to be held that the company is estopped from availing itself of the defense of a lack of proper notice under the policy, it must be upon the testimony of Mr. Thomas being found to be true by the court.

"Mr. Thomas' testimony was in the first place quite positive he talked with Mr. McCaffery and later he qualified it and it was either Mr. McCaffery or Mr. Stevens. In view of the fact that it is established that Mr. McCaffery was out of the city at the time, in view of the fact that we have the positive testimony of Mr. Stevens that there was no such conversation, and in

the light of the surrounding circumstances, I am forced to hold that the plaintiff has not established that phase of its case by a fair preponderance of the evidence."

On direct examination, Dowell testified as follows:

"Q. When did the truck come on your job? A. The day before the accident. Q. Do you remember about when the accident happened? A. The 15th of June, 1934. Q. When this accident happened did you notify the agent from whom you had gotten this policy, of the accident? A. Yes. Q. Did you notify him in writing or verbally? A. Verbally. Q. When with reference to the accident? A. The following morning. Q. Whom did you notify? A. Mr. Thomas of the Western Insurance Agency. Q. Did he advise you at that time what he would do with reference to reporting it to the United Pacific? A. He said he would take it up with the company. Q. Did you later hear from him with reference to his having taken it up with them? A. Yes. Q. When with reference to the time you reported it? A. Soon afterwards. I don't know just how many days. Q. About how soon? Can you give us your best judgment? A. I believe it was within a week. Q. What did he advise you? A. That the company denied liability. Q. Did you at any later date have up with the United Pacific Casualty Insurance Company for discussion this policy, and whether or not this policy covered this accident we have referred to? A. Yes. Q. With whom did you discuss it? A. Mr. Stevens. Q. Who was he? A. He was the claim agent of the United Pacific. Q. Do you recall when that was that you discussed it with him? A. It was in the fall; in October, I believe. Q. What did he tell you? A. He said his company was in the clear and was not liable."

Thomas, on direct examination, testified:

"Q. I will ask you when you first heard of this accident out toward Everett where four ladies were seriously injured, in which Mr. Dowell was involved? A. The day of the accident. Q. Where did you learn it? A. From Mr. Dowell. He called me first on the 'phone. Q. Did you tell him what you would do with reference to the insurance company? A. I told him I would

notify them immediately. Q. Did you do that? A. I did. Q. Whom did you call up? A. I called the claim department, and I believe I talked with Mr. McCaffery. Q. What did he tell you? A. He denied liability. Q. Did he tell you to notify the insured of that fact? A. Yes, sir. Q. Did you notify Mr. Dowell? A. Immediately. Q. As far as the United Pacific Casualty Insurance Company is concerned you write considerable business with that company, do you? A. Yes. We have been agents for them since 1929. Q. You are the agent that signed this policy? A. Yes, sir. Q. And you are still the agent of this company? A. Yes, sir."

On cross-examination, Thomas testified:

"Q. I am asking you what you asked Mr. Dowell at the time about this accident he reported. A. Mr. Dowell called me and reported to me that a truck owned by H. O. Seiffert of Everett had collided with a passenger car and seriously injured four or five people, and he didn't know the minute details of the situation at the time, and asked me what to do about it, and I said 'I will report it to the company immediately,' which I did."

A careful examination of the record convinces us that, although written notice was not given promptly, verbal notice was given with seasonable promptness. The policy and the endorsements attached thereto clearly indicate that Thomas, of the Western Insurance Brokers, Inc., was a duly authorized agent of respondent at the time of the execution of the policies and at the time of the accident in question. The testimony shows the practice usually is for the agent of the company to report an accident by telephone to the home office.

While it is true that appellant did not forward a written report to the home office, it appears that a verbal report was made of the accident by communicating with Thomas, of Western Insurance Brokers,

Inc. It may well be that the trial court correctly concluded that the testimony of Thomas was not entitled to much weight; and inasmuch as the trial court was in a position to observe the demeanor of the witness and to evaluate his credibility by reason of his physical presence, we cannot disagree with the conclusion of the trial court with respect to the credibility of the testimony of Thomas.

Dowell, however, also testified that he notified Thomas of the accident. There is nothing in the record to indicate that the trial court questioned the testimony of Dowell on this point. Hence, even if Thomas was derelict in forwarding this report to the home office claim department of respondent, still respondent was chargeable with the notice received by its authorized agent.

"The law imputes to the principal, and charges him with, all notice or knowledge relating to the subject-matter of the agency which the agent acquires or obtains while acting as such agent and within the scope of his authority, or, according to the weight of authority, which he may previously have acquired, and which he then had in mind, or which he had acquired so recently as to reasonably warrant the assumption that he still retained it. Provided, however, that such notice or knowledge will not be imputed: (1) Where it is such as it is the agent's duty not to disclose; (2) Where the agent's relations to the subject-matter are so adverse as to practically destroy the relation of agency; and, (3) Where the person claiming the benefit of the notice, or those whom he represents, colluded with the agent to cheat or defraud the principal." 2 Mechem on Agency (2d ed.), 1397, § 1813.

"The principal, according to a settled rule of law, is bound by the knowledge of the agent, or—otherwise stated—notice to the agent constitutes notice to the principal, the rule being derived from the duty of disclosure by the former to the latter of all the material

facts coming to his knowledge with reference to the subject of his agency, and a presumption that he has discharged that duty. While the failure of an agent to communicate to his principal information acquired by him in the course and within the scope of his agency is a breach of duty to his principal, yet the notice has the same effect as to third persons as though his duty had been faithfully performed." 21 R. C. L. 838, § 21.

To the same effect are 2 C. J. 863, § 542; *Staats v. Pioneer Ins. Ass'n*, 55 Wash. 51, 104 Pac. 185; *Alaska Steamship Co. v. Pacific Coast Gypsum Co.*, 78 Wash. 247, 138 Pac. 875; and *Miller v. United Pac. Cas. Ins. Co.*, 187 Wash. 629, 60 P. (2d) 714.

A provision for "immediate notice" contained in an insurance policy is not to be disregarded. Its obvious purpose is to enable the insurer to inform itself promptly concerning a given accident, so that it may investigate the circumstances, prepare for a defense, if necessary, and be advised whether it is prudent to settle any claim arising therefrom. The term "immediate notice," however, is to be given a reasonable application under the facts and circumstances of each particular case. The record convinces us that reasonable notice was given here. *McKenna v. International Indemnity Co.*, 125 Wash. 28, 215 Pac. 66; *Coolidge v. Standard Acc. Ins. Co.*, 114 Cal. App. 716, 300 Pac. 885; *Chapin v. Ocean Acc. & Guarantee Corp.*, 96 Neb. 213, 147 N. W. 465, 52 L. R. A. (N. S.) 227; *Oakland Motor Co. v. American Fidelity Co.*, 190 Mich. 74, 155 N. W. 729; *Farrell v. Nebraska Indemnity Co.*, 183 Minn. 65, 235 N. W. 612.

We shall discuss the remaining assignments of error collectively.

After a careful examination of the terms of master policy No. W111260, we are satisfied that the policy provided a general liability coverage with re-

spect to a certain 1924 White 5-ton truck bearing motor number 348871. If the Seiffert truck, however, a White truck bearing motor number 3A1565, is to be brought within the terms of the policy, it is essential that endorsement No. 1 was intended and required to be an integral part of the master policy.

That endorsement provides:

"In consideration of the premium stated in the policy to which this endorsement is attached, the Company agrees to cover, in addition to the motor vehicle and/or trailers named in the policy, *any additional, emergency, or substituted motor vehicles* and/or trailers for a period of ten days from date of beginning of use of such equipment, without such equipment being added by endorsement; . . ."

While it is true that statutory endorsement No. 1 embodies the form of endorsement recited in rule 35, *supra,* it is reasonable to suppose that the parties intended to incorporate the statutory endorsement into the policy and to make it an integral and essential part thereof so as to extend the coverage to additional, emergency or substituted motor vehicles. The validity of the regulations promulgated by the department has not been questioned. We are convinced that the purpose for attaching endorsement No. 1 to the policy was not simply for filing the same with the department of public works, but to comply with the law and regulations issued pursuant thereto to extend the coverage to additional, emergency or substituted equipment.

The policy contemplated the protection of appellant against legal liability incident to the maintenance and ownership, not only of the automobile truck described in the policy, but also additional, emergency or substituted motor vehicles automatically for a ten day period from the date of the beginning of the use of such equipment employed by appellant.

"Provisions may be incorporated in insurance policies by slips or riders, which will be construed with the printed provisions of the policy, but, if there is an irreconcilable conflict, the slip or rider will prevail. *Corporation of Roman Catholic Church v. Royal Ins. Co.*, 158 La. 601, 104 So. 383. (To the same effect, *Mixon v. St. Paul Fire & Marine Ins. Co.*, 147 La. 302, 84 So. 790.)

"Unless the rider on the insurance policy is irreconcilable with the printed clause, such clause must stand; but if it is inconsistent and irreconcilable, the rider will control. *Aetna Ins. Co. v. Sacramento-Stockton S. S. Co.* [273 Fed. 55], *supra.* To the same effect are *Aetna Ins. Co. v. Houston Oil & Transport Co.*, 49 F. (2d) 121; *Ducommun v. Strong Inter-State Exchange,* 193 Wis. 179, 212 N. W. 289, 214 N. W. 616; *Jackson v. British America Assurance Co.*, 106 Mich. 47, 63 N. W. 899, 30 L. R. A. 636. See, also, 1 Couch, Cyclopedia of Insurance Law, § 159; Richards, Law of Insurance (4th ed.), 110; 32 C. J. 1159; 14 R. C. L. 934; Restatement of Law of Contracts, § 236." *Miller v. Penn. Mutual Life Ins. Co.*, 189 Wash. 269, 64 P. (2d) 1050.

The existing statute is incorporated into and made a part of a contract to which it is applicable, so that even an involuntary lien may be preferred as against a mortgage made subsequent to the passage of the law. *Sitton v. Dubois,* 14 Wash. 624, 45 Pac. 303.

To the same effect, in principle, is *Roeblings Sons Co. v. Frederickson L. & T. Co.*, 153 Wash. 580, 280 Pac. 93.

We have held that the surety on a statutory bond is held to the performance of not only statutory, but additional obligations provided for in the bond or contract in which the strict statutory conditions are adopted. *Puget Sound State Bank v. Gallucci,* 82 Wash. 445, 144 Pac. 698, Ann. Cas. 1916A, 767; *Western Steel Casting Co. v. Edland,* 187 Wash. 666, 61 P. (2d) 155.

Likewise, in the instant case the statutes relating

to transportation by motor vehicles and the rules formulated pursuant thereto entered into and formed a part of the instant insurance policy.

Assured's policy endorsement No. 2 fortifies and confirms the above conclusion. This endorsement also shows that the parties intended the original master policy with endorsement No. 1 attached thereto to be the agreement of the parties, and that the supplemental policy was prepared for the sole purpose of complying with the requirements of chapter 166, Laws of 1933, p. 613, as amended by chapter 55 of Laws of 1933, Ex. Ses., p. 138, and the departmental rules issued pursuant thereto.

Endorsement No. 2 provides in part:

". . . *as between the Company and the Assured, the policy to which this endorsement is attached shall be considered as the real or true contract between the parties* and that the limits of Liability therein set forth represent the total or gross liability of the Company.

"All terms and conditions of the policy to which this endorsement is attached remain unchanged except as herein specifically provided." (Italics ours.)

██ Respondent maintains that it was the intention of the parties to limit appellant's protection to for-hire operations only; and since permit No. F. H. 920 issued by the department of public works authorized appellant to operate motor vehicles only as a "for-hire carrier" and for the transportation of "tractors, steam shovels and other contractors' equipment and heavy machinery in the state of Washington," that the Seiffert truck, while engaged in hauling gravel, was not a for-hire carrier and was not engaged in the transportation of equipment authorized by the permit, and hence falls without the coverage of the policy. It also argues that, since truck No. 14 was taken from the fleet of trucks carrying gravel and sent to South Bend to haul heavy equipment for third parties, and

since the Seiffert truck took its place, that the Seiffert truck did not constitute "additional, emergency or substituted" equipment within the terms of the endorsement. These contentions are without merit.

There is nothing on the face of the master policy, or on endorsement No. 1 attached thereto, to indicate that the parties thereto contemplated that appellant would restrict its operations to that of a for-hire carrier and that appellant's protection and respondent's liability were conditioned upon for-hire operations only. True, appellant did secure order M. V. No. 10674 granting it a permit to operate motor vehicles as a for-hire carrier, but there is nothing in the policy which indicates an intent to limit the coverage of the policy to for-hire operations exclusively. The language recited therein provides a general liability coverage. Moreover, an examination of the legislative history of public liability insurance applicable to transportation by motor vehicles on the public highways clearly indicates that the schedule of one thousand dollars, five thousand dollars and ten thousand dollars has been and was applicable to "for-hire" carriers and "contract" carriers at the time this policy was executed. Laws of 1933, p. 617, chapter 166, § 5; p. 620, § 15; and Laws of 1933, Ex. Ses., p. 146, chapter 55, § 7.

In the absence of an express provision in the policy limiting coverage to for-hire operations, it was not essential that appellant engage in for-hire operations exclusively to fall within the coverage of the policy. Hence, whether the operations of appellant were in the nature of "for-hire" or "contract" operations, is immaterial and is not decisive of this case.

It follows that it is not necessary to inquire as to whether appellant should have secured an additional permit or modified the existing permit to embrace

other items than those designated in the permit, inasmuch as this is not material in determining liability under the policy.

█ Respondent insists that the endorsement was not placed upon the policy for appellant's benefit, but for the benefit of those who may suffer damage from the operation recited in the endorsement. This contention is without merit. A liability policy is one in which the insurer assumes the liability of the insured. *Johnson v. McGilchrist,* 174 Wash. 178, 24 P. (2d) 607; *Gooschin v. Mercer Casualty Co.,* 178 Wash. 114, 34 P. (2d) 435; *Hinton v. Carmody,* 186 Wash. 242, 57 P. (2d) 1240, 60 P. (2d) 1108.

█ Respondent argues that, since the endorsement was not prepared by respondent nor by its experts, but that its form was imposed upon both parties to the contract, the general rule to the effect that ambiguous expressions in policies will be resolved against the insurance company is not applicable. While it is true that the existence of statutory endorsements may afford a reason for a showing of tolerance in the application of this rule, we believe that this rule is applicable to the instant case in determining the intention of the parties to make endorsement No. 1 an integral part of the master policy.

"The intention of the parties to the contract of insurance must be gathered from the contract itself, from the risks excluded as well as from the risks included." *Stone v. Insurance Co. of North America,* 56 Wash. 427, 105 Pac. 856.

"In construing the language of the policy, if construction is needed, we are to keep in mind the familiar rule, that the construction will be adopted which is most favorable to the insured.

" 'There is another principle applying to contracts of insurance to the effect that, if they are so drawn as to require interpretation and fairly susceptible of two different conclusions, the one will be adopted

most favorable to the insured; and will be liberally construed in favor of the object to be accomplished, and conditions and provisions therein will be strictly construed against the insurer, as they are issued upon printed forms prepared by experts at the instance of the insurer, in the preparation of which the insured has no voice. *Algoe v. Pacific Mutual Life Ins. Co.,* 91 Wash. 324, 157 Pac. 993, *Fenton v. Poston,* 114 Wash. 217, 195 Pac. 31, *Thompson v. Brotherhood of American Yeomen,* 130 Wash. 179, 226 Pac. 498, *Continental Life Insurance Co. v. Wells,* 38 Ga. 99, 142 S. E. 900, *Matthews v. Modern Woodmen of America,* 236 Mo. 326, 139 S. W. 151.' *Guaranty Trust Co. v. Continental Life Ins. Co.,* 159 Wash. 683, 294 Pac. 585." *Braley Motor Co. v. Northwest Cas. Co.,* 184 Wash. 47, 49 P. (2d) 911.

See, also, *O'Toole v. Empire Motors,* 181 Wash. 130, 42 P. (2d) 10.

Respondent also asserts that, under the express terms of the endorsement, the recovery of a judgment against appellant is a condition precedent to recovery under the policy.

The record shows that the injuries sustained by the occupants of the Dodge automobile who were injured were very severe, and there is no showing of bad faith, unreasonableness, or lack of prudence in the compromises effected. While it is true that the terms of endorsement No. 1 imply that the liability of the insurance company is dependent upon the recovery of a judgment against the insured by the injured party, and while it is true that a compromise does not rise to the dignity of a judgment, we are satisfied that the compromise effected was arranged in such a manner and fixed the liability with such a status of finality that it is tantamount to a judgment as contemplated by rule No. 35, *supra,* and the endorsement on the policy. *Keseleff v. Sunset Highway Motor Freight Co.,* 187 Wash. 642, 60 P. (2d) 720.

"The law favors an amicable settlement of claims of this character, and when such a settlement appears to have been fairly made, and has not been secured by fraud, false representations or overreaching, it must be sustained. *Owens v. Norwood White Coal Co.* (Iowa), 138 N. W. 483, 491; *Schweikert v. Davis Lumber Co.,* 147 Wis. 242, 133 N. W. 136; *Railway Co. v. Bennett,* 63 Kan. 781, 66 Pac. 1018." *Nath v. Oregon R. & Nav. Co.,* 72 Wash. 664, 131 Pac. 251.

To the same effect, see 12 C. J. 336, § 32.

■ Moreover, the insurer had reasonable notice of the pendency of these actions by the injured parties against the insured and was requested to assume the defense of these actions, but declined to do so, electing to disclaim coverage; and hence it is bound by the settlement effected by appellant. *O'Toole v. Empire Motors, supra; Howe v. Howe,* 87 N. H. 338, 179 Atl. 362.

"With respect to the defense of actions brought against one insured against liability for injury to a nonemployee, the rules are largely the same as in the case of employers' liability policies. Thus, an insurer who is impleaded, but denies liability and refuses to defend, in violation of its contract, is liable to the amount of its policy in case judgment is taken against the insured. Nor can a public liability insurer, after breaching its contract to defend all actions against the insured, avoid liability, when sued on its contract, by setting up concededly reasonable and fair voluntary settlements made by the insured subsequent to such breach of contract, although the insurance contract provides that the insured shall make no settlement except with the written consent of the insurer." 5 Couch, Cyclopedia of Insurance Law (1929) 4142, § 1165b.

■ Respondent also asserts that the fact that the Seiffert truck was covered by insurance by its owner renders appellant's policy inapplicable with respect to the accident presented here.

Endorsement No. 1 provides:

"If the assured owns or operates a motor vehicle or motor vehicles other than those described in this policy, this policy does not extend to any vehicle covered by other valid insurance for limits of liability equal to or in excess of the limits of liability required by said chapter or by the rules and regulations of the Department."

The mere fact that Seiffert had liability insurance protecting him as owner of the truck does not render the general liability protection of appellant's policy ineffective. The purpose of this provision is that, in the event appellant had other insurance covering the vehicles, the instant policy was not to be applicable thereto. The mere fact that Seiffert had liability insurance protecting himself, individually, as the owner of the Seiffert truck, does not restrict in any manner the general liability protection provided for in appellant's policy.

*Allen v. American Fidelity & Cas. Co.*, 54 F. (2d) 207, cited by respondent, involves a public liability policy in Texas. The policy sued on insured against loss only for the vehicles described in Statement 6:

" 'The above described automobiles and motor vehicles are and will be used only for compensation, for transfer of merchandise purposes, and will be operated as follows: Within the State of Texas, under Permit "B" and this insurance covers no other use or operation.' By indorsement, however, its coverage was extended to 'all motor vehicles belonging to or under the direction of assured, whether particularly identified in the policy or not, while same are being used in the business of carrying property for hire or compensation, and come within the terms of the statute above referred to,' and it was provided, 'this policy covers legal liability to the named assured from such operation of such vehicles, even though such vehicles may not be specifically identified herein.' "

The court found the insured had no license, was not operating the truck under a permit, no identification plate had been paid for or issued to it, no amount of insurance prescribed by the commission upon it, and no premium paid on account of it. The case is distinguishable from the case at bar, because the policy only applied to motor vehicles operating under Permit B, whereas in the instant case, the policy and endorsement No. 1 are silent with respect to the acquisition of permits and the nature of the carrier operations.

The judgment must be, and is, reversed.

STEINERT, C. J., MAIN, BEALS, and ROBINSON, JJ., concur.