[No. 45317-3-I.   Division One.   February 12, 2001.]

U.S. OIL & REFINING CO., *Appellant*, v. LEE & EASTES TANK LINES, INC., *Respondent*.

*Daniel F. Mullin* and *Kristen Dorrity* (of *Abbott, Davis, Rothwell, Mullin & Earle, P.C.*), for appellant.

*John T. Dalton, Jr.* and *Nathaniel J.R. Smith* (of *Merrick Hofstedt & Lindsey*); *Molly E. Farr* (of *Lane Powell Spears Lubersky, L.L.P.*); *Thomas C. Stratton* and *Scott G. Busby* (of *Eklund Rockey Stratton, P.S.*); and *Stephen G. Skinner* (of *Johnson Christie Andrews & Skinner, P.S.*), for respondent.

ELLINGTON, J. — This case involves the enforceability of a loan receipt agreement. Lee & Eastes admits that it breached its agreement to procure insurance covering U.S. Oil. Because the loan receipt between U.S. Oil and its own insurer is valid and enforceable, and because U.S. Oil was damaged by Lee & Eastes' breach, we affirm the trial

court's summary judgment as to liability, but remand for recalculation of damages consistent with the loan receipt.

## FACTS

U.S. Oil & Refining Company owns and operates a petroleum product loading facility in Tacoma, Washington. In 1985, U.S. Oil and Lee & Eastes Tank Lines, Inc. entered into a "Self-Load Participation Agreement" under which Lee & Eastes was authorized to load and transport petroleum products (hot asphalt) from U.S. Oil's facility without the presence of U.S. Oil employees.

In the self-load agreement, Lee & Eastes agreed to indemnify U.S. Oil from any claim by any third party arising out of Lee & Eastes' self-load operations, to "maintain at its own expense, policies of insurance with responsible insurers satisfactory to U.S. Oil which will afford protection and coverage,"[1] and to name U.S. Oil as an additional insured on its comprehensive general liability (CGL) policy, among other policies. Coverage was to be for "not less than $1,000,000 for injury to, or death of, any one person, and not less than $1,000,000 for injury arising out of any one occurrence."[2] Lee & Eastes also agreed to obtain blanket contractual liability insurance covering its agreement to indemnify U.S. Oil, with coverage in the same amounts. Lee & Eastes promised to deliver to U.S. Oil certificates of insurance providing that "no cancellation, termination or material change of the coverages certified shall be made by the insurer for any cause without thirty days prior written notice to U.S. Oil."[3]

U.S. Oil's former chief executive officer testified that the indemnification and insurance provisions were intended to provide U.S. Oil complete protection "for all claims which might arise out of the presence of Lee & Eastes' employees

---

[1] Clerk's Papers at 39.

[2] Clerk's Papers at 40.

[3] Clerk's Papers at 40.

on the premises."[4] Lee & Eastes presented no contrary evidence. Lee & Eastes' vice-president testified the agreement was not negotiated but merely sent by U.S. Oil and signed by him with certain modifications not relevant here.

Until 1990, Lee & Eastes maintained a blanket endorsement under which parties with whom Lee & Eastes contracted were automatically added as additional insureds. In 1990, however, Lee & Eastes' insurance broker, Pettit-Morry Company, moved Lee & Eastes' insurance coverage to Great West Casualty Company. Because Pettit-Morry was not a broker for Great West, Pettit-Morry entered into a joint venture with broker RIS Insurance Services (RIS). The new policy did not contain the same endorsement, and U.S. Oil was not named as an additional insured.

In April 1994, a Lee & Eastes employee, Ernest Bliss, was injured while loading petroleum products at U.S. Oil's facility. Bliss brought suit against U.S. Oil, alleging failure to maintain a safe workplace and to warn of dangerous conditions.

U.S. Oil tendered its defense to Lee & Eastes and Great West. Both rejected the tender. U.S. Oil then turned to its own insurer, U.S. Fire Insurance, with which U.S. Oil had coverage for the Bliss claim. U.S. Oil and U.S. Fire executed a loan receipt agreement which provided in part:

1. U.S. Fire agrees to advance funds sufficient to cover fees and expenses incurred in defending the *Bliss* claim. U.S. Fire also agrees to advance the costs in settling or paying a judgment of the *Bliss* claim, but not to exceed U.S. Fire's stated policy limits. U.S. Fire further agrees to advance litigation costs and expenses relating to the pursuit of claims described in paragraph 2 below. All advances shall constitute a loan, repayable only out of the proceeds obtained from the claims described in paragraph 2 below. U.S. Oil acknowledges that all advanced monies are a loan and not payments or indemnification under U.S. Fire's policy.

2. U.S. Oil agrees to pursue in its own name, including the

---

[4] Clerk's Papers at 495.

filing of suit, any and all claims it may have against Lee & Eastes for the failure to accept tender of the *Bliss* claim, including Lee & Eastes' promise to indemnify U.S. Oil and their breach of contract in failing to have U.S. Oil made an additional insured on its liability insurance.[5]

U.S. Oil settled with Bliss for $275,000. Attorney's fees and costs of defense totaled $50,040.66. U.S. Oil paid these sums using funds advanced by U.S. Fire under the loan receipt agreement.

In August 1998, U.S. Oil brought suit against Lee & Eastes for breach of contract and indemnification,[6] seeking to recover the entire amount of the Bliss settlement and the fees and costs of defense. Lee & Eastes admitted it "was contractually obligated under the Agreement to name plaintiff U.S. Oil as an additional insured under a comprehensive general liability insurance policy of Lee & Eastes with liability limits of not less than $1,000,000 which covered bodily injury,"[7] and that U.S. Oil was not so named, but denied that its breach damaged U.S. Oil. Lee & Eastes brought in third-party defendants Pettit-Morry and RIS, alleging breach of contract and negligence in their failure to obtain from Great West the blanket additional-insured endorsement naming U.S. Oil.

U.S. Oil and Lee & Eastes both moved for summary judgment. Pettit-Morry and RIS filed motions supporting Lee & Eastes and opposing U.S. Oil. The court ruled that Lee & Eastes breached the self-load participation agreement by failing to name U.S. Oil as an additional insured, but limited U.S. Oil's damages to $25,000—the amount of its deductible under its U.S. Fire policy.[8] The court entered

---

[5] Clerk's Papers at 101.

[6] The trial court dismissed U.S. Oil's indemnification claim, presumably because in the agreement, Lee & Eastes did not expressly waive immunity from employee suit under the Industrial Insurance Act. *See Brown v. Prime Constr. Co.*, 102 Wn.2d 235, 239-40, 684 P.2d 73 (1984); *Waters v. Puget Sound Power & Light Co.*, 83 Wn. App. 407, 408, 924 P.2d 925 (1996). U.S. Oil does not appeal that order.

[7] Clerk's Papers at 39-40.

[8] The trial court also concluded there was an issue of fact as to U.S. Oil's

final judgment as to all claims involving U.S. Oil under CR 54(b). The court stayed Lee & Eastes' claims against Pettit-Morry and RIS, pending resolution of this appeal. U.S. Oil appeals; Lee & Eastes cross appeals. All four parties filed briefs with this court.

## DISCUSSION

▮ This court reviews a summary judgment order de novo, drawing all inferences in favor of the nonmoving party. Summary judgment is proper if the record shows that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.[9]

### Waiver

As an initial matter, we must determine whether U.S. Oil waived its rights under the self-load agreement. The agreement required Lee & Eastes to deliver certificates of insurance to U.S. Oil, which it did not do. Nor did U.S. Oil ever request it do so. Lee & Eastes argues U.S. Oil's failure to demand the certificates amounted to "accepting incomplete performance," and constituted waiver of U.S. Oil's "right to claim a breach" of the self-load agreement.[10]

▮ "[W]aiver is the intentional and voluntary relinquishment of a known right," which may be inferred from circumstances indicating an intent to waive.[11] Waiver may be express or by implication.[12] "To constitute implied waiver, there must exist unequivocal acts or conduct evidencing an intent to waive; waiver will not be inferred from

---

damages for an alleged increase in its insurance premiums. U.S. Oil waived such damages for purposes of obtaining final judgment as to its own claims.

[9] *Green v. A.P.C.*, 136 Wn.2d 87, 94, 960 P.2d 912 (1998).

[10] Br. of Resp't/Cross-Appellant at 26.

[11] *Jones v. Best*, 134 Wn.2d 232, 241, 950 P.2d 1 (1998).

[12] *Jones*, 134 Wn.2d at 241.

doubtful or ambiguous factors."[13] The party asserting waiver bears the burden of proving an intention to relinquish the right.[14]

▮ Lee & Eastes does not explain how U.S. Oil's failure to demand proof of performance constitutes a waiver of its right to the performance itself. The only authority cited by Lee & Eastes for its argument is *Douglas Northwest, Inc. v. Bill O'Brien & Sons Construction.*[15] There, a general contractor "never mentioned, relied upon, or sought to enforce" a provision in a contract requiring a subcontractor to obtain a permit, and instead itself obtained the permit.[16] Later, the general contractor asserted failure to obtain the permit as a defense to the subcontractor's action for delay damages. The trial court found that the general contractor never relied on the subcontractor to obtain the permit, and that delays in issuance of the permit were caused by the general contractor.[17] We concluded the general contractor could not assert a breach, noting that the general contractor gave the subcontractor "every indication that it would take care of the permit issues, and this is in fact what occurred."[18] *Douglas Northwest* does not stand for the proposition that acceptance of incomplete performance constitutes a waiver, or precludes a claim of breach. In addition, the facts here are entirely dissimilar. No issue in this case turns on the certificates of insurance. The claim here arises not from the absence of certificates, but from the absence of the required coverage.

Lee & Eastes' argument is that had U.S. Oil insisted upon its right to the certificates, both parties would have learned of the absence of coverage, and therefore U.S. Oil cannot now "claim a breach" of the contract's coverage

---

[13] *Jones*, 134 Wn.2d at 241.

[14] *Jones*, 134 Wn.2d at 241-42.

[15] 64 Wn. App. 661, 828 P.2d 565 (1992).

[16] *Douglas N.W.*, 64 Wn. App. at 675.

[17] *Douglas N.W.*, 64 Wn. App. at 675.

[18] *Douglas N.W.*, 64 Wn. App. at 675-76.

requirement. This argument turns the contract obligations of the parties upside down. First, the certificate requirement was not imposed in order to remind Lee & Eastes of its obligations under the contract. Second, unlike *Douglas Northwest*, where the permit delay allegedly caused the loss, U.S. Oil's failure to demand the certificates is completely unrelated to the loss caused by the absence of coverage. U.S. Oil's permission to allow Lee & Eastes to enter the property and load U.S. Oil's product without supervision was explicitly predicated upon Lee & Eastes' promise to procure additional-insured coverage for U.S. Oil. U.S. Oil's failure to demand proof of performance does not constitute unequivocal evidence of an intent to relinquish its rights to the performance itself. Lee & Eastes' waiver argument fails.

## Loan Receipt Agreement

We turn next to the loan receipt agreement between U.S. Oil and U.S. Fire. Lee & Eastes argues that the loan receipt should not be enforced and that without it, U.S. Oil has no right to recovery because it has been fully compensated by its insurer. The trial court found that Lee & Eastes breached its obligation to procure insurance, and that U.S. Oil was damaged in the amount of $25,000, the amount of its deductible under its U.S. Fire policy.[19] The reasoning underlying the court's damage award is not in the record, but the award is effectively a rejection of U.S. Oil's loan receipt agreement with U.S. Fire.

A "loan receipt" agreement is a lawful arrangement by which the insurer advances to its insured the amount of a covered loss as a loan, repayable only and to the extent that the insured obtains a net recovery from others also liable.[20] Loan receipts serve several purposes.

---

[19] Implicit in the court's judgment is a determination that no issue of material fact exists regarding Lee & Eastes' obligation to obtain coverage for U.S. Oil that would have applied to the Bliss claim. We discuss this issue *infra*.

[20] 16 GEORGE J. COUCH, COUCH CYCLOPEDIA OF INSURANCE LAW § 61:75 (rev. vol. Mark S. Rhodes ed, 2d ed. 1983).

They permit prompt payment to the insured, while avoiding the necessity and consequences of a subrogation action.[21] "The primary effect of a loan receipt is to keep alive a third person's liability to the insured for the loss and to permit an action against such third person to be prosecuted in the insured's name."[22]

■ Lee & Eastes argues that the loan receipt agreement is invalid because U.S. Fire had a "pre-existing duty" to pay under its policy with U.S. Oil. Our Supreme Court rejected this argument in *Clow v. National Indemnity Co.*[23] Clow and his insurer, Farmers Insurance Exchange, executed a loan receipt under which Farmers advanced the amount Clow paid to settle a covered claim. Clow was obligated to repay Farmers in the event he recovered from a co-insurer. There is no question that Farmers had a "pre-existing duty" to pay Clow. Farmers could have pursued National Indemnity in a subrogation action. The trial court ruled that by virtue of the loan receipt, Clow was not in fact damaged, and that the action should have been brought by Farmers.[24] The Supreme Court reversed, holding the loan receipt permitted Clow to maintain the action against National Indemnity:

> The plaintiff simply disclaimed a right to retain the proceeds, which was proper, inasmuch as he had already assigned them to a third party, but the fact that he had no right to retain them for himself did not deprive him of his cause of action.[25]

---

[21] *Luckenbach v. W.J. McCahan Sugar Ref. Co.*, 248 U.S. 139, 148-49, 39 S. Ct. 53, 63 L. Ed. 170 (1918); *see also* 16 COUCH ON INSURANCE § 61:75 (2d rev. ed.). Justice Brandeis commented on the birth of loan receipt agreements: "It is creditable to the ingenuity of business men that an arrangement should have been devised which is consonant both with the needs of commerce and the demands of justice." *Luckenbach*, 248 U.S. at 149.

[22] V. Woerner, Annotation, *Insurance: Validity and Effect of Loan Receipt or Agreement Between Insured and Insurer for a Loan Repayable to Extent of Insured's Recovery from Another*, 13 A.L.R. 3D 42, 49 (1967).

[23] 54 Wn.2d 198, 339 P.2d 82 (1959).

[24] *Clow*, 54 Wn.2d at 201.

[25] *Clow*, 54 Wn.2d at 204. As in *Clow*, loan receipt agreements are commonly used where the insured has more than one source of insurance coverage or

The Supreme Court reached a similar result in an indemnification action involving a loan receipt agreement. In *Consolidated Freightways, Inc. v. Moore*,[26] the court held that "[the] cause of action is not defeated by the insurance company's payment of the judgment," explaining that a contract to indemnify would be treated in the same way as an insurance contract for purposes of the loan receipt:

> It is a well settled rule in tort actions that a party has a cause of action notwithstanding the payment of his loss by an insurance company. The purpose of this rule is to implement the insurance company's right of subrogation, and not to afford the respondent a double recovery.
>
> It [subrogation] is a device adopted by equity to compel the ultimate discharge of an obligation by him who in good conscience ought to pay it.
>
> That insurance company recoveries, under their right of subrogation, most often flow from tort actions is quite natural, but without significance. Subrogation is an equitable principle and applies to contract rights as fully as it does to tort actions.
>
> By his contract the appellant bound himself to pay the loss. Respondent has a contractual right to recover it from him. This cause of action is not defeated by the insurance company's payment of the judgment. The insurer is subrogated to respondent's contract right of indemnity. This sustains the cause of action against appellant for the identical reason that subrogation sustains a tort action where the plaintiff has been paid for his loss.[27]

The Supreme Court later restated the holding of *Clow*: "There we held, in accord with the majority of other jurisdictions, that nothing in the execution of such an agreement alters the fact that the insured is the real party in interest."[28] It is thus clear that the "pre-existing duty" of

---

indemnification. While Lee & Eastes does not argue that the absence of a second insurer matters here, we note that we see no basis for a different analysis merely because there is a contract to procure insurance, rather than another insurer.

[26] 38 Wn.2d 427, 229 P.2d 882 (1951).

[27] *Consolidated*, 38 Wn.2d at 430-31 (citations and quotation marks omitted).

[28] *Weber v. Biddle*, 72 Wn.2d 22, 28, 431 P.2d 705 (1967) (not error to refuse to

the plaintiff's insurer does not defeat the loan receipt.

Lee & Eastes makes a closely related argument: that U.S. Oil has no claim because it has suffered no damage, having already been compensated by U.S. Fire. This argument is founded upon the premise that the collateral source rule does not apply in contract cases. Lee & Eastes relies on a California case, *Patent Scaffolding Co. v. William Simpson Construction Co.*[29] There, three fire insurers sued a general contractor that had failed to obtain agreed-upon fire insurance for the insured subcontractor's work and materials. No loan receipt was involved. The question presented was whether the insurers were equitably subrogated to their insured's cause of action for breach of duty to indemnify or to obtain insurance.[30]

Noting that the collateral source rule[31] is generally inapplicable in contract cases,[32] such that the insured, being fully compensated by its insurers, could not also recover from the breaching party, the court held that the subcontractor could not have recovered damages.[33] Turning to the insurers' subrogation claims, the court held the elements of equitable subrogation were not satisfied because the third party's breach did not cause the loss.[34]

We find *Patent* inapposite, because it did not involve a loan receipt agreement. The court was therefore considering the issues in the context of the collateral source rule and

instruct jury that the case was a subrogation action where an insurer paid $10,000 to its insured under a loan receipt agreement).

[29] 256 Cal. App. 2d 506, 64 Cal. Rptr. 187 (1967).

[30] *Patent*, 64 Cal. Rptr. at 190.

[31] "The common law collateral source rule allows an injured party to recover compensatory damages from a tort-feasor without regard to payments the injured party received from a source independent of the tort-feasor." *Johnson v. Weyerhaeuser Co.*, 134 Wn.2d 795, 798, 953 P.2d 800 (1998) (collateral source rule applies in worker's compensation proceedings).

[32] "Patent could recover twice for the same loss only if the 'collateral source' rule applies." *Patent*, 64 Cal. Rptr. at 191.

[33] *Patent*, 64 Cal. Rptr. at 191.

[34] *Patent*, 64 Cal. Rptr. at 192.

subrogation rules. The collateral source rule plays no part in the context of a loan receipt arrangement because the advance constitutes payment only if, and to the extent that, the insured does not recover from the breaching party. There is thus no possibility of double recovery for the insured. And since the insured sues the breaching party directly, subrogation principles do not apply.[35]

For purposes of the loan receipt agreement, we see no reason to treat a contract to procure insurance differently from the contract to indemnify considered in *Consolidated*. In both situations, the effect is the same: the insured sues upon the contract breach, and the insurer is subrogated to the insured's right under the contract.

Our Supreme Court recently reiterated its view of loan receipt agreements in *McRory v. Northern Insurance Co.*[36] McRory was sued for negligent defamation. He had two sources of coverage—his professional liability policy with Wausau, and a commercial general liability policy with Northern. Northern declined coverage. Wausau accepted the defense and fully funded a settlement. McRory sued Northern and prevailed on the coverage question. In considering whether McRory was entitled to recover attorney's fees under *Olympic Steamship Co. v. Centennial Insurance Co.*,[37] the court confronted Northern's argument that Wausau was the real party in interest:

> We have rejected this contention. If an insurer loans money to an insured and the insured recovers against a third party, the loan agreement is enforceable and the insured may proceed against the third party.
>
> . . . .
>
> Washington law permits an insured to sue an insurer for the entirety of the loss regardless of whether the insured has

---

[35] Where a loan receipt is a loan and not a payment, "the insurer is not subrogated and the action may be brought by the insured." *Clow*, 54 Wn.2d at 202.

[36] 138 Wn.2d 550, 980 P.2d 736 (1999). *McRory* was decided after the trial court's judgment in this case.

[37] 117 Wn.2d 37, 811 P.2d 673 (1991).

received partial reimbursement from another insurer. . . . As the insured, McRory may certainly seek to enforce the benefit of his bargain with his primary insurer, Northern.[38]

The court in *McRory* again rejected the argument that the insured suffered no loss, pointing out that McRory received the benefit of his bargain from Wausau but not from Northern.[39]

We hold the loan receipt between U.S. Oil and U.S. Fire is valid and enforceable.

## Scope of Coverage Owed to U.S. Oil by Lee & Eastes

The remaining question is the extent of Lee & Eastes' liability for its failure to obtain the coverage required by the self-load agreement. Lee & Eastes argues its breach caused no damage to U.S. Oil because, under the endorsement Great West would allegedly have issued naming U.S. Oil an additional insured on Lee & Eastes' policy, the Bliss claim would not have been covered. Lee & Eastes submitted affidavits from employees of Great West asserting that the additional-insured endorsement would have covered U.S. Oil only to the extent U.S. Oil was liable for Lee & Eastes' conduct.[40] Because the Bliss complaint alleged no wrong-

---

[38] *McRory*, 138 Wn.2d at 556-58 (citations omitted).

[39] *McRory*, 138 Wn.2d at 559.

[40] We reject U.S. Oil's argument that the declarations from Great West concerning the endorsement and its effect on the Bliss suit should have been stricken because they were not made on personal knowledge. The declarants incorporated as their own those statements attributed to them in Lee & Eastes' opposition to U.S. Oil's motion for summary judgment, and each declarant also attested the statements were based on personal knowledge. The western regional underwriting manager identified the endorsement that Great West "would have been issued to Lee & Eastes in 1994 if such an endorsement had been requested." Clerk's Papers at 168. No doubt the underwriting manager has personal knowledge as to what endorsement would typically have been offered; while there may be little relevance to his statement, we see no lack of personal knowledge. A claims representative stated that the described endorsement would not have covered the Bliss claims against U.S. Oil because "the accident occurred on the U.S. Oil site, . . . U.S. Oil attributes the fault for the accident to Mr. Bliss, and . . . U.S. Oil maintains it is not liable whatsoever." Clerk's Papers at 174. Although this largely constitutes a legal conclusion, the information is arguably relevant to the court's understanding of the insurer's position. Finally, Lee & Eastes' vice-president of

doing by Lee & Eastes, Lee & Eastes argues its failure to obtain the endorsement caused U.S. Oil no damage. The trial court rejected this argument as speculative, presumably because the Great West affidavits just indicate the routine followed upon request for a standard additional-insured endorsement. What would actually have occurred had Lee & Eastes' brokers requested the coverage previously enjoyed is unknown.[41]

■ ■ Speculative or not, Lee & Eastes' argument depends upon the unstated premise that whatever coverage Great West "would have" issued by way of an additional-insured endorsement would necessarily have satisfied Lee & Eastes' obligation under the self-load agreement. The proper question is not what endorsement Great West would have issued, but what coverage Lee & Eastes was required to procure. This is a question of the intent of the parties to the self-load agreement.[42]

Lee & Eastes agreed to directly indemnify U.S. Oil from claims of third parties arising out of Lee & Eastes' self-load operation, to maintain insurance "which will afford protection and coverage," and to name U.S. Oil as an additional insured on its CGL policy, with coverage "not less than $1,000,000 for injury to, or death of, any one person, and not less than $1,000,000 for injury arising out of any one

operations provided a declaration explaining the relationship between the company, its insurance brokers, and its insurer. Such statements appear to be within the personal knowledge of the vice-president of operations. We see no error in the court's denial of the motion to strike.

U.S. Oil also assigns error to the court's denial of its oral motion to strike the second (joint) declaration of Paul Mazzaglia and Gary Jaques because it was submitted two days before the summary judgment hearing. CR 56(c) provides that affidavits supporting opposition to summary judgment be filed no later than 11 calendar days before the hearing. But the second declaration merely clarified the first. The trial court did not err.

[41] After this litigation commenced, Great West apparently issued additional-insured endorsements tailored to the nature of the operations of the entities with which Lee & Eastes had contracted.

[42] See W. Wash. Corp. of Seventh-Day Adventists v. Ferrellgas, Inc., 102 Wn. App. 488, 495, 7 P.3d 861 (2000) ("A court's purpose in interpreting a contract is to ascertain the parties' intent."); Berg v. Hudesman, 115 Wn.2d 657, 663, 801 P.2d 222 (1990).

occurrence."[43] The obvious purpose of these provisions is to protect U.S. Oil from liability arising out of Lee & Eastes' unsupervised use of its facilities.

The purpose of the agreement and the conduct of the parties are benchmarks for determining intent.[44] The obvious purpose of the coverage requirement is to enable Lee & Eastes to use U.S. Oil's facility unsupervised without risk to U.S. Oil. Lee & Eastes' conduct is consistent with this purpose. In carrying out its obligations at the inception of the agreement, Lee & Eastes obtained a blanket additional-insured endorsement covering U.S. Oil (and others with which it had agreements), which was in place for many years. Under the blanket endorsement, it is undisputed that U.S. Oil would have had coverage for the Bliss claim.[45]

Lee & Eastes was unaware the same blanket endorsement was not issued when its brokers moved its coverage to Great West. In Lee & Eastes' third party complaint against its brokers, it asserted:

> In failing to obtain the Blanket Additional Insured Endorsement Pettit-Morry Company and RIS Insurance Services have caused Lee & Eastes Tank Lines, Inc. to be involved in litigation with U.S. Oil & Refining Co., which results in Lee & Eastes Tank Lines, Inc., incurring costs and attorney fees, and which may result in Lee & Eastes Tank Lines incurring liability. Pettit-Morry Company and RIS Insurance Services are therefore liable for indemnification and payment of the

---

[43] Clerk's Papers at 39-40. The parties do not appear to dispute that the Bliss accident constituted an "occurrence" within the Great West policy.

[44] *Ferrellgas*, 102 Wn. App. at 495.

[45] The blanket additional-insured endorsement in effect from 1986 to 1989 provided:

> It is agreed that the persons insured provision of the policy is amended to include any person, organization, trustee, estate or governmental entity to whom or to which the named insured has consented, by virtue of a written agreement or by the issuance or existence of a permit to provide insurance such as is afforded by this policy, but *only with respect to operations performed by or on behalf of the named insured or to facilities used by named insured* and then only for the limits of liability specified in such contract, but in no event for limits of liability in excess of the applicable limits of liability of this policy.

Clerk's Papers at 529 (emphasis added).

costs, fees, and any liability assessed to Lee & Eastes Tank Lines, Inc., as a result of their breach of fiduciary duties and/or based on principles of equitable indemnity and/or surety.[46]

From this evidence, it appears that both parties intended that Lee & Eastes obtain insurance covering any claim against U.S. Oil arising out of Lee & Eastes' use of its facilities.[47] Such an intent is entirely consistent with the purpose of the agreement. This is therefore the most reasonable reading of the self-load agreement, and we affirm the trial court's summary judgment that the failure of Lee & Eastes to name U.S. Oil an additional insured breached the self-load agreement and resulted in damage to U.S. Oil.

■■ Lee & Eastes argues that even if the self-load agreement required coverage for U.S. Oil for the Bliss claim, questions of fact remain regarding the reasonableness of the Bliss settlement and the relative fault of U.S. Oil, Bliss, and Lee & Eastes. It asserts that it is not "bound by" the terms of U.S. Oil's settlement with Bliss, because U.S. Oil unreasonably excluded Lee & Eastes from settlement negotiations. We reject these arguments. Lee & Eastes declined U.S. Oil's tender of defense, and cannot now insist upon reexamining the settlement in the complete absence of any evidence suggesting the settlement was unreasonable.[48] Nor is there any issue requiring a determination of relative fault. Relative fault is a tort law concept. Lee & Eastes breached a contract, and the only question is whether the insurance it failed to procure would have covered U.S. Oil's liability on the Bliss claim. On this question, there is no genuine issue of material fact.

---

[46] Clerk's Papers at 18.

[47] The parties dispute whether the endorsement obtained by Lee & Eastes after the Bliss lawsuit naming U.S. Oil an additional insured would cover Bliss' claim. The record is inadequate to answer this question, but its resolution is irrelevant, since the conduct we examine is that after the contract and before the alleged breach. *See Berg*, 115 Wn.2d at 668.

[48] *See L.J. Dowell, Inc. v. United Pac. Cas. Ins. Co.*, 191 Wash. 666, 689, 72 P.2d 296 (1937).

## Calculation of Damages

■■■ Lee & Eastes raises several issues regarding the calculation of damages. First, it asserts that U.S. Oil is not entitled under the self-load agreement to recover its attorney fees and costs of defense in the Bliss litigation. But the insurance agreement Lee & Eastes did not obtain would have covered such expenses if it also covered the claim itself. The expenses are properly part of U.S. Oil's damages.

■■■ Most important, Lee & Eastes points out that both the U.S. Fire and Great West policies were primary, and each would have shared equally in the total cost of indemnification and defense. Lee & Eastes thus argues that in its effort to recover from Lee & Eastes the entire amount, U.S. Oil overreaches. We agree. U.S. Oil is entitled to recover from Lee & Eastes only half that amount, because both the U.S. Fire and Great West policies provided for contribution from other primary insurers by equal shares.[49] In addition, U.S. Oil owes its own deductible to U.S. Fire regardless,[50] and points to no basis upon which Lee & Eastes would have been obligated to pay any part of it.

## CONCLUSION

The loan receipt agreement between U.S. Oil and U.S. Fire is to be enforced as a loan. The self-load agreement required Lee & Eastes to maintain coverage for claims such as the Bliss claim and to name U.S. Oil as an additional insured, and Lee & Eastes' failure to do so caused U.S. Oil damage in the amount of half the total cost of the Bliss settlement, including costs and expenses, less its deductible. We therefore affirm the trial court's judgment as to

---

[49] *See Mission Ins. Co. v. Allendale Mut. Ins. Co.*, 95 Wn.2d 464, 466-68, 626 P.2d 505 (1981).

[50] U.S. Oil acknowledges it is unconditionally obligated to pay the $25,000 deductible to U.S. Fire.

liability, but remand for reassessment of damages consistent with this opinion.

Affirmed in part, reversed in part, remanded.

BECKER, A.C.J., and COX, J., concur.

Motions for reconsideration denied March 28 and May 8, 2001.