82 S.E.2d 903 (1954)
STATE ex rel. STATE ROAD COMMISSION
v.
O'BRIEN, Secretary of State.
No. 10683.
Supreme Court of Appeals of West Virginia.
Submitted June 8, 1954.
Decided June 15, 1954.
Dissenting Opinion July 27, 1954.
Donald L. Schaffer, Charleston, for relator.
John G. Fox, Atty. Gen., Robert E. Magnuson, Asst. Atty. Gen., for respondent.
BROWNING, Judge.
The State Road Commission of West Virginia invoked the original jurisdiction of this Court by filing herein its petition for a writ of mandamus seeking to require the respondent, D. Pitt O'Brien, Secretary of State of West Virginia, to attest and affix the great seal of the State of West Virginia to a bridge revenue bond issued by the petitioner, pursuant to the provisions of Code, 17-17, as amended. A rule was issued returnable on June 8, 1954, at which time the respondent appeared and demurred to the petition on the ground that the statutory provision authorizing and directing the State Road Commission to allocate from the *904 State Road Fund sufficient funds to pay the principal and interest on Bridge Revenue Bonds, if there are insufficient funds in the State Sinking Fund to pay the principal and interest on such bonds, is violative of Article X, Section 4 of the West Virginia Constitution.
Pursuant to the provisions of Chapter 8, Acts of the Legislature, Regular Session, 1929, the State Road Commission adopted a resolution authorizing the issuance and sale of $1,800,000 of toll bridge revenue bonds. The bond in question, being one of that issue, is for the purpose of paying this State's proportionate share of the cost of a bridge to be constructed across the Kanawha River at Winfield, West Virginia, the Federal Government having provided a like sum for that purpose. The resolution, after first stating that the bonds shall not be an indebtedness of the State of West Virginia or any political subdivision thereof, provided for the payment of principal and interest out of the revenues to be derived from the operation of the bridge, but further states: "* * * the Commission covenants that, as additional security for the payment of principal and interest on the Bonds, it will allocate and transfer to the State Sinking Fund Commission from the moneys in the State Road Fund, any sums needed for the payment of principal or interest on said bonds * * * to the full extent that the moneys on deposit in the Sinking Fund [from the bridge revenues] * * * are insufficient for the payment of the principal and interest * * *."
The pertinent statutory provisions are: "Any bridge or bridges constructed under the provisions hereof and forming a connecting link between two or more state highways, or providing a river crossing for a state highway, are hereby adopted as a part of the state road system, but no such bridge or bridges shall be constructed without the approval in writing of the state road commissioner and the governor. If there be in the funds of the state sinking fund commission an amount insufficient to pay the interest and sinking fund on any bonds issued for the purpose of constructing such bridge or bridges, the state road commission is authorized and directed to allocate to said commission, from the state road fund, an amount sufficient to pay the interest on said bonds and/or the principal thereof, as either may become due and payable."
The constitutional provision with which it is alleged by the demurrer that this legislation is in conflict, Article X, Section 4, follows: "No debt shall be contracted by this State, except to meet casual deficits in the revenue, to redeem a previous liability of the State, to suppress insurrection, repel invasion or defend the State in time of war; but the payment of any liability other than that for the ordinary expenses of the State, shall be equally distributed over a period of at least twenty years."
In 1942, the people of this State amended their Constitution by adding Section 52 to to Article VI, which section reads as follows: "Revenue from gasoline and other motor fuel excise and license taxation, motor vehicle registration and license taxes, and all other revenue derived from motor vehicles or motor fuels shall, after deduction of statutory refunds and cost of administration and collection authorized by legislative appropriation, be appropriated and used solely for construction, reconstruction, repair and maintenance of public highways, and also the payment of the interest and principal on all road bonds heretofore issued or which may be hereafter issued for the construction, reconstruction, or improvement of public highways, and the payment of obligations incurred in the construction, reconstruction, repair and maintenance of public highways."
The framers of our Constitution, being acutely aware of the experience of the Commonwealth of Virginia with debts contracted by it, and with the numerous suits resulting in heavy judgments and costs against her, in 1872 adopted the provisions of Article X, Section 4, providing that this State should not contract indebtedness except in specified instances.
This Court held in Bates v. State Bridge Commission, 109 W. Va. 186, 153 S.E. 305, that bridge revenue bonds did not constitute debts of the State of West Virginia when *905 payment of such bonds was to be made exclusively from the revenues derived from the project, and respondent makes no contention to the contrary. Neither is it contended that under the broad powers with which it is invested that the State Road Commission could not construct, as a part of the State Road system, if it desired and funds were available therefor, a free bridge at Winfield, with moneys from the State Road Fund, inasmuch as such bridge will form a connecting link between two state highways, and provide a river crossing for a State highway. The issue thus presented, as to whether toll bridge revenue bonds, the primary security for the payment of which is the income from the project, may be further secured by pledging the resources of the State Road Fund upon condition that the income from the primary source becomes inadequate, is one of first impression in this State. If such procedure constitutes the contraction of a debt by the State, it is prohibited by Article X, Section 4, of the Constitution. Although novel to this jurisdiction, an examination of the authorities shows that the question has arisen and been decided in many others.
In 49 Am.Jur. 280, States, Territories, and Dependencies, § 67, under the subheading "Obligations payable from Special Funds", this statement appears:
"Although the cases are not entirely in accord and dissenting opinions have been frequent, it has generally been held that an obligation payable from a special fund created by the imposition of fees, penalties, or excise taxes, and for the payment of which the general credit of the state is not pledged and resort may not be had to property taxation, is not a debt within the meaning of constitution debt limitations. Such a limitation applies solely to that arising from a general levy and not excise taxes."
Many states have followed the so-called "Special Fund Doctrine", even where such funds were created and segregated solely by statutory authority, without the benefit of a constitutional provision. In Willett v. State Board of Examiners, 112 Mont. 317, 115 P.2d 287, 289, the issuance of bonds was proposed for the construction of a state building, the bonds being payable out of two funds, a Veteran's Memorial Fund, and income from the Capitol Building land grant. The court, in holding that the issuance of such bonds did not create a debt in violation of the constitutional provisions of that state, said: "The next point raised is that the Act authorized the creation of a debt contrary to section 2, Article XIII of the Constitution. That section prohibits the creation of a debt in excess of $100,000 unless the law authorizing it shall have been submitted to the people. However, it should be noted that the bonds authorized by Chapter 79 are not an obligation payable from the general fund of the State of Montana. The bonds are expressly made payable from the two funds named in the Act, and the Act does not contemplate the levy of any taxes for the purpose of discharging the bonds. When bonds are made payable from a fund in being, and where they will not involve the levy or collection of any additional tax, there is no debt created within the meaning of section 2 of Article XIII. * * *" To the same effect is State ex rel. Capitol Addition Bldg. Comm. v. Connelly, 39 N.M. 312, 46 P.2d 1097, 1101, 100 A.L.R. 878, where the issuance of bonds had been authorized for the construction of an addition to the State Capitol Building, and provision was made that the bonds were to be paid from a specified amount levied upon every civil action filed in the state courts. The court, holding that no debt was created in the constitutional sense, said:
"With these obvious implications that the framers of the Constitution were writing and thinking of a debt repayable from the proceeds of a property tax levy against the general assessment rolls, it is easy to believe that the debt whose creation is thus prohibited, or whose amount is so limited, is one pledging the general faith and credit of the state or other subdivision, with a consequent right in the holders of such indebtedness to look to the general taxing power to satisfy the same.

* * * * * *
*906 "And so we conclude that the debentures in question, neither requiring nor warranting a resort to the general taxing power of the state for their retirement, but payable instead from proceeds of an imposition in the nature of an excise laid upon all civil actions filed with the various district clerks of the state, in addition to the regular docket fee, to be converged into a special fund in the hands of the state treasurer, will not constitute a general obligation on the part of the state. Hence, they are not within the interdiction of article 9, § 8, of the State Constitution."
The South Carolina court reaffirmed its position approving the special fund doctrine in State ex rel. Coleman v. Lewis, 181 S.C. 10, 186 S.E. 625, 632, citing several previous decisions of that court, and by the use of the following language appears to have taken a more extreme stand than any other court upon this question: "We have consistently held that bonds issued by the state or its political subdivisions which are payable out of special funds do not create debts of the state or its political subdivisions, although the full faith, credit, and taxing powers of the state or its political subdivisions are pledged for the payment of the same, where the revenues provided for are reasonably sufficient to pay the principal and interest of the obligations incurred." To the same general effect are the following cases: Moses v. Meier, 148 Or. 185, 35 P.2d 981; Ajax v. Gregory, 177 Wash. 465, 32 P.2d 560; Briggs v. Greenville County, 137 S.C. 288, 135 S.E. 153; State ex rel. Richards v. Moorer, 152 S.C. 455, 150 S.E. 269; State ex rel. Crawford v. Stevens, 173 S.C. 149, 175 S.E. 213.
The Virginia court, where the validity of a provision in a bond revenue act for toll bridges, authorizing the use of funds available for the construction of state highways for the redemption of such bonds was questioned, held, in Almond v. Gilmer, 188 Va. 822, 51 S.E.2d 272, that the act was not unconstitutional, inasmuch as the commission or the legislature could exercise discretion as to whether the holders of the bonds should be paid interest and principal if the necessity arose, and that, therefore, the state was not directly or contingently obligated to make appropriations for their payment. There is authority to the contrary. In Boswell v. State, 181 Okl. 435, 74 P.2d 940, 950, involving certain notes secured by a pledging of revenues derivable from a gasoline tax, pursuant to statutory authority, the court held the statute unconstitutional, using this rather pungent language: "A careful study of the various authorities cited by defendants discloses that in some jurisdictions the failure to observe the distinction between a particular fund derived from a specific tax levied for a specific purpose, which has been termed a `special fund,' and a fund partaking of the nature of a trust fund derivable from a self-liquidating project under the `special fund doctrine,' has led to a confused interpretation and to an unwarranted extension of the `special fund doctrine,' which we refuse to follow."
In accord with the Boswell case is People ex rel. City of Chicago v. Barrett, 373 111. 393, 26 N.E.2d 478, in which a statute authorizing the state to borrow money to construct roads, and pledge revenues from motor fuels to the payment of the indebtedness, was held in conflict with the debt provision of the Constitution. It is interesting to observe, however, that in neither case was the fund pledged created by constitutional amendment, but by statutes diverting part of the general revenues of the state. Even so, the Boswell case, supra, was decided by a closely divided court, five to four.
It would appear that the courts of other jurisdictions are unanimous in holding that a constitutional fund may be pledged to the payment of revenue bonds without violating debt provisions of their Constitutions, similar to those contained in Article X, Section 4, of the Constitution of this State.
In Alabama State Bridge Corp. v. Smith, 217 Ala. 311, 116 So. 695, 699, a statute provided for the issuance of revenue bonds to construct toll bridges, and pledged gasoline tax revenues and moneys available from *907 the state convict department as security for such bonds, in addition to the tolls to be collected. A constitutional amendment had previously pledged the gas tax fund, and the state convict fund, for use in highway construction, repair and maintenance. The court upheld the constitutionality of the act, pledging these funds as additional security, and said: "* * * Our judgment is that `debt,' within the meaning, the purview, the whole content, of the constitutional provision, is that which the state in any event is bond to pay, an obligation secured by the general faith and credit of the state. Bonds that may be issued for the construction of bridges under this act will not evidence such an obligationwill not be so secured. * * * If these special funds should for any reason fail of realization, or should be exhausted in execution of the primary purposes for which they may be raised, nothing will be left to creditors advancing money on the faith of the bonds authorized but the right to collect tolls. There is no promise on the part of the state to pay in any event; there is no pledge that there will be a surplus of any fund; there is no pledge of the general credit of the state; there will be no debt within the meaning of section 213."
The Colorado court, in a leading case on the question, in Johnson v. McDonald, 97 Colo. 324, 49 P.2d 1017, 1025, held that the pledging of a constitutional fund does not constitute the creation of a debt within the meaning of the Constitution of that state. The court said: "* * * a debt is created when an obligation is created that requires revenue from a tax otherwise available for general purposes to meet it. The payment of the anticipation warrants out of the fund provided by the act can never place any burden on the revenues available for appropriation for general state purposes."
The Washington court held, in Gruen v. State Tax Commission, 35. Wash.2d 1, 211 P.2d 651, 679, that the constitutional debt limitation provision of that state did not prohibit the payment of bonds out of a special fund, supplied by an excise tax, stating:
"The cases which we have considered state what must be held to be the unanimous view of the courts of this country upon the question of whether or not bonds payable out of a special fund, supplied by an excise tax, constitute a debt within the meaning of constitutional limitations fixing a general debt limitation. Based upon those cases and the cited cases decided by this court, which indicate an approval of the special fund doctrine and, further, that excise taxes are not controlled by constitutional provisions, we hold that the issuance and sale of bonds provided for in this act do not in any way constitute a debt against the state of Washington. The bonds provided for are to be paid from a special fund and solely from anticipated revenues to be derived from the sale of cigarettes. They are not, and cannot be, a general obligation of the state. In the event the anticipated profits do not materialize and the fund becomes exhausted, the purchaser of the bonds has no legal redress against the state. He must look solely to the fund upon which they are drawn.
"Whether there would be a moral obligation to redeem the bonds is a matter which does not concern this court. It is sufficient to say there is no legal obligation to do so in the event the special fund is exhausted. In that event, there will be no additional tax burden by reason thereof; for, as just stated, there is no general obligation on the part of the state to redeem the bonds. * * *"
To the same effect are the following cases: "Ziegler v. Witherspoon, 331 Mich. 337, 49 N.W.2d 318; State ex rel. Syvertson v. Jones, 74 N.D. 465, 23 N.W.2d 54; Ajax v. Gregory, 177 Wash. 465, 32 P.2d 560; State ex rel. Richards v. Moorer, 152 S.C. 455, 150 S.E. 269; Moses v. Meier, 148 Or. 185, 35 P.2d 981; California Toll Bridge Authority v. Kelly, 218 Cal. 7, 21 P.2d 425.
This Court is not required to, upon the issue involved in this case, and does not, approve *908 the authorities, heretofore quoted, based upon the so-called "Special Fund Doctrine", inasmuch as the State Road Fund, which is pledged to pay any deficits occurring in principal and interest from toll bridge revenue bonds, is a constitutional fund, implemented by the provisions of Code, 17-17-22 as amended, which directs the State Road Commission to allocate to the State Sinking Fund Commission, funds to pay the interest and principal on any bonds issued for the purpose of constructing bridges. The resolution adopted by the relator specifically states that such bonds are only secondarily secured by the State Road Fund, and that the primary security for the payment of the bonds are the revenues derived from the use of the bridge. Furthermore, the resolution provides that the bonds are not to be an indebtedness of the State of West Virginia, or any political subdivision thereof, but that, of course, is a judicial, not a legislative, question. It is not necessary to, nor does this Court, approve by its decision in this case, the authorities cited wherein it has been held that the word "debt" in other Constitutions refers only to the creation of a debt payable from funds raised by ad valorem property taxes. To so hold would render innocuous the protective provision of Article X, Section 4, of the Constitution of this State, in view of the fact that since the tax limitation Amendment of 1932, the ad valorem tax on property, as a source of State revenue, has become relatively unimportant, and the major sources of this State's revenues are excise and privilege taxes.
Furthermore, there is no inconsistency between Article X, Section 4, and Article VI, Section 52, of the State Constitution. Except for the purposes therein stated, Article X, Section 4, prohibits the contracting of a debt by this State. Article VI, Section 52, merely creates a fund into which all revenues from gasoline, and other motor fuel, excise and license taxation, motor vehicle registration and license fees, and all other revenues, derived from motor vehicles, or motor fuels, shall go, and provides that such funds shall be used only for the construction, reconstruction or improvement' of public highways, and the payment of obligations incurred therein. This section is not self-enacting, and the fund created by it must rely upon legislative enactment for its resources. It does not provide that any revenue shall come into the fund, but it does provide that if, by legislative enactment, taxes are derived from certain sources, they may not go into any other fund or be used for any other purpose. In other words, the moneys which go into this fund do not constitute a part of the general revenues of the State, since they can not be used for general purposes, but only for the purposes specified in the Amendment. The State Road Commission and the Governor, together, have the authority to take from the State Road Fund sufficient funds, if they are available, to build a bridge at Winfield. They also have the authority to pay one-half of the cost of the project out of the fund and accept the other one-half from the Federal Government. In either case, the funds supplied by the State would come out of the State Road Fund. The administrators of this Fund have the authority to, and responsibility for, providing a bridge at this place to facilitate travel in this industrial and agricultural area, and under the plan proposed for the financing of its construction, by which the Federal Government furnishes one-half of the funds therefor, and revenue bonds are to be sold to provide the other half, they may do so without any cost to the Fund, inasmuch as its liability for securing the bonds is secondary. If payments in the future are required to be made from the Fund, upon its secondary contingent liability, it will be for a purpose for which the Fund was created, and for a project as deserving and necessary as any other for which its funds might be expended. If the additional contingent security is not given, the bonds may not be soldthe bridge may not be builtor, if sold, the premiums and higher interest rate would be additional burdens placed upon those interested in the enterprise. Of course, neither the great need for the improvement, nor the financial attractiveness to the taxpayers, would validate the proposal if it created a debt within *909 the meaning of Article X, Section 4, of the Constitution. This Court holds that it does not. The resolution providing for the issuance of these bonds, and the words contained in them, make it clear to all who purchase them, that they are not general obligations of the State of West Virginia, and do not pledge the full faith and credit of this State. This is a pledge of funds in a constitutional fund, established by the people of this State for the purpose for which the pledge is made. This action does not bind any future Legislature to impose new, or continue present, taxes which, by the Constitutional Amendment, must go into this Fund. The Legislature may continue such taxes at the present rate, it may raise them, or it may abolish all taxes that are directed into this Fund. There is no contractural assurance that sufficient funds will be available in the State Road Fund to pay the principle or interest on the bonds in question in case it becomes necessary to do so. There is the practical assurance, however, that the automobile is here to stay, and so are taxes.
In most of the cases approving the Constitutional Fund Doctrine, the liability was primary and direct. Here it is only secondary and contingent. If revenue is not provided by the tolls from the bridge to pay the principal of, and interest on, these bonds, the only other security for such payment is the State Road Fund. Neither the general revenues, nor any other revenues of this State are committed to the payment of such principal and interest, and therefore, the bonds are not, and can not be, a general obligation of this State. It follows, therefore, that no debt is created as inhibited by Article X, Section 4, of the Constitution.
We conclude that the demurrer of the respondent to the relator's petition must be overruled, and the writ of mandamus will issue, directing the respondent to attest and affix the great seal of the State of West Virginia to the bond in question.
Writ awarded.
LOVINS, Judge (dissenting).
I respectfully dissent from the conclusion reached by the Court in this proceeding.
This proceeding arises upon the act of the State Road Commission in pledging the special fund created by Section 52, Article VI, Constitution of West Virginia, which reads in part as follows: "Revenue from gasoline and other motor fuel excise and license taxation, motor vehicle registration and license taxes, and all other revenue derived from motor vehicles or motor fuels shall, after deduction of statutory refunds and cost of administration and collection authorized by legislative appropriation, be appropriated and used solely for construction, reconstruction, repair and maintenance of public highways, and also the payment of the interest and principal on all road bonds heretofore issued or which may be hereafter issued for the construction, reconstruction or improvement of public highways, and the payment of obligations incurred in the construction, reconstruction, repair and maintenance of public highways."
The Road Commission, acting under the authority of the following statute pledged the fund created by Section 52, above quoted, as security for the payment of certain revenue bonds issued to raise funds to pay in part for the construction of a bridge at Winfield, West Virginia, under the authority given by the following statute: "Any bridge or bridges constructed under the provisions hereof and forming a connecting link between two or more state highways, or providing a river crossing for a state highway, are hereby adopted as a part of the state road system, but no such bridge or bridges shall be constructed without the approval in writing of the state road commissioner and the governor. If there be in the funds of the state sinking fund commission an amount insufficient to pay the interest and sinking fund on any bonds issued for the purpose of constructing such bridge or bridges, the state road commission is authorized and directed to allocate to said commission, from the state *910 road fund, an amount sufficient to pay the interest on said bonds and/or the principal thereof, as either may become due and payable." Chapter 117, Article 17, Section 22, Acts of the Legislature, 1949, Regular Session.
The theory on which the Court's opinion is based is that a pledge of funds derived under the provisions of Section 52, Article VI, Constitution of West Virginia, does not constitute a debt within the meaning of Section 4, Article X of the Constitution.
At the outset, it may be said that there is considerable authority to sustain that conclusion from other jurisdictions. For want of a better term, the theory may be named the special fund theory or doctrine. This is a somewhat new development in constitutional law, and seems to be based on the fact that revenue derived from general taxation is separate and distinct from revenue derived from excise and license taxation.
Section 4, Article X of the Constitution of West Virginia reads as follows: "No debt shall be contracted by this State, except to meet casual deficits in the revenue, to redeem a previous liability of the State, to suppress insurrection, repel invasion or defend the State in time of war; but the payment of any liability other than that for the ordinary expenses of the State, shall be equally distributed over a period of at least twenty years."
I think that Section 35, Article VI of the Constitution of West Virginia, reading in part as follows: "The State of West Virginia shall never be made defendant in any court of law or equity, * * *" is likewise appropriate for consideration. Sections 52 and 35 of Article VI were adopted by the people of this State in order to establish a "pay as you go" system of finnacing. Having regard to the unfortunate history of the finances of the Commonwealth of Virginia, and the burden placed on this State by decrees pronounced by the Supreme Court of the United States in the case of Commonwealth of Virginia v. State of West Virginia, 220 U.S. 1, 31 S.Ct. 330, 55 L.Ed. 353, (see opinions in the same case, 231 U.S. 89, 34 S.Ct. 29, 58 L.Ed. 135; 234 U.S. 117, 34 S.Ct. 889, 58 L.Ed. 1243; 238 U.S. 202, 35 S.Ct. 795, 59 L.Ed. 1272; 241 U.S. 531, 36 S.Ct. 719, 60 L.Ed. 1147 and 246 U.S. 565, 38 S.Ct. 400, 59 L.Ed. 1272), I am loathe virtually to abolish the twin safeguards against debt. The people of this State, at the time of the adoption of the present Constitution were mindful of the pitfalls and dangers attendant upon unrestrained expenditures of public funds to be derived from revenues in the future, and no doubt intended to erect permanent barriers against involuntary and voluntary creation of debts and thus prevent a recurrence of near insolvency which existed before the separation of this State from the Commonwealth of Virginia.
The framers of our present Constitution and the people who adopted it had in mind that they would erect such barriers against the recurrence of such condition approaching financial chaos. Notwithstanding that purpose and intent, we see at least two indirect approaches to weaken, if not destroy, those safeguards. First: The decisions of this Court in the moral obligation cases indirectly allow the imposition of a debt by court order or decree. To me, these cases are proceeding against the State of West Virginia through the State Auditor for the collection of debts allegedly incurred by the commission of torts by its agents, servants and employees. The trend of the "moral obligation" cases is to impose an involuntary indebtedness on the State. Second: The instant case will eliminate the difference between self-liquidating revenue projects, the cost of which is to be paid by the pledge of funds derived from the general levy of excise and license taxes to secure the payment of costs of such revenue project. This approach permits the voluntary assumption of secondary liability for a debt contracted on the basis of paying for a structure or improvement out of what I regard as general road funds derived from the general levy of license and excise taxes.
It is to be noted that Article X, Section 4, inhibits incurring a debt, except for specific *911 purposes: (1) To meet casual deficits in the revenue, (2) to redeem a previous liability of the State, (3) to suppress insurrection, (4) to repel invasion or defend the State in time of war. It is to be further noted that the same section referred to "liability", which is a general and more inclusive term than "debt".
"Interpretation differs from construction in that the former is the art of finding out the true sense of any form of words; that is, the sense which their author intended to convey; and of enabling others to derive from them the same idea which the author intended to convey. Construction, on the other hand, is the drawing of conclusions, respecting subjects that lie beyond the direct expressions of the text, from elements known from and given in the text; conclusions which are in the spirit, though not within the letter of the text." 1 Cooley's Constitutional Limitations, Eighth Edition, page 97.
Bearing in mind the difference between interpretation and construction, we could well apply the statement made by that able writer, Judge Story, in his work on the Constitution: "In the first place, then, every word employed in the Constitution is to be expounded in its plain, obvious, and common sense, unless the context furnishes some ground to control, qualify, or enlarge it. Constitutions are not designed for metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of human life, adopted to common wants, designed for common use, and fitted for common understandings. The people make them, the people adopt them, the people must be supposed to read them, with the help of common-sense, and cannot be presumed to admit in them any recondite meaning or any extraordinary gloss." Section 451, 1 story on the Constitution, Fifth Edition.
A grave question is here presented and deserves more than superficial consideration and treatment. As above stated, the doctrine herein is that of "special fund." Some courts have permitted the pledging of special funds created by statute and held that such pledge did not create a debt within the meaning of the Constitution.
As heretofore stated, the doctrine invoked in this case is known as the "special fund doctrine." This court has approved one phase of that doctrine which permits the use of a specific fund derived from specific revenues derived from the project or structure for which the debt is contracted. Bates v. State Bridge Comm., 109 W.Va. 186, 153 S.E. 305. This Court in Bates v. State Bridge Comm., supra, applied the generally accepted rule. Almond v. Gilmer, 188 Va. 822, 51 S.E.2d 272, Miller v. City of Buhl, 48 Idaho 668, 284 P. 843, 72 A.L.R. 687; Bankhead v. Town of Sulligent, 229 Ala. 45, 155 So. 869, 96 A.L.R. 1385 and Interstate Power Co. v. Incorporated Town of McGregor, 230 Iowa 42, 296 N.W. 770, 146 A.L.R. 328.
Other courts have permitted the pledging of a special fund created and ear-marked by statute. Other jurisdictions have permitted the pleding of a special fund created and ear-marked by constitutional provision.
The decision in the instant case extends the "special fund doctrine" beyond Bates v. State Bridge Comm., supra, and allows the pledging of a special fund created and allegedly ear-marked by a constitutional provision.
Where a special fund created by statute is pledged, the following criticism of such principle is appropriate: "* * * the Legislature, or the debt-contracting authority, could divide the public revenue into numerous subdivisions, calling one the `road fund,' another the `school fund,' another the "agricultural fund,' another the `public health fund,' and others almost without limit. Debts could then be contracted in unlimited amounts and payable in the far distant future, and still be immune from attack as violating constitutional provisions limiting indebtedness provided each debt was made payable out of some one of the *912 specially designated funds into which all of the revenue collected by taxation from the people had been divided. A mere statement of the proposition carries with it, it seems to us, its own refutation." State ex rel. Diederichs v. State Highway Commission, 89 Mont. 205, 296 P. 1033, 1035. See Crick v. Rash, 190 Ky. 820, 229 S.W. 63.
At this point, it is fair to say that the Court's opinion in the instant case is written on the theory that a special fund is invoked by the Constitution and will not be subject to such changes as are indicated in the above quotation.
In dealing with the "special fund doctrine", and considering questions similar to that here presented, the Supreme Court of Oklahoma held that an attempt to pledge a portion of gasoline tax and a conditional pledge of a portion of motor vehicle registration taxes violated the constitutional provisions limiting the State's indebtedness. Boswell v. State, 181 Okl. 435, 74 P.2d 940, A similar conclusion was reached in the case of People ex rel. City of Chicago v. Barrett, 373 Ill. 393, 26 N.E.2d 478.
I think Boswell v. State, supra, and People ex rel. City of Chicago v. Barrett, supra, represent a sound conclusion on this question. There is some doubt whether the special fund created by Article VI, Section 52, is in law a special fund. See Boswell v. State, supra.
It seems to be the opinion of this Court in holding to the opposite view that if the general revenues of the State are not pledged, no debt within the meaning of the Constitution is created. I think that applying the rule as hereinabove stated, with reference to the interpretation of the Constitution, a debt means "A sum of money due by certain and express agreement; as by bond for a determinate sum, a bill or note, a special bargain, * * *". Black's Law Dictionary, Fourth Edition, page 490. 1 Bouv.Law Dict., Rawle's Third Revision, p. 786. True, the pledge here considered is a secondary and conditional debt. Nevertheless, it conditionally binds this State to devote a special fund raised by general excise taxation to the payment of bonds issued for a self-liquidating local project.
There is another element to be considered. The instant decision opens the door for unlimited pledging of the constitutional State Road Fund to secure specific road projects all over this State.
It is entirely possible and also within the range of probability that the constitutional special road fund will be so depleted that it will be practically non-existent. What course of action could be then taken to provide funds for the general construction, repair and maintenance of a much needed road improvement or construction? It is not believed that any taxing power within this State would have the temerity or the inclination to resist a demand for increased road facilities when shown to be indispensable or a demand for necessary repairs of existing roads. Thereupon general taxation would of necessity be resorted to take the place of funds theretofore taken from the special road fund established by Section 52, Article VI of the Constitution, to meet such liabilities as may arise under this decision.
After all, under the situation disclosed by this proceeding and exigencies made necessary by progress and development of this State, the general levies of this State are indirectly affected by the pledge of the constitutional Road Fund to pay for self-liquidating projects.
It is also said that there is no commitment by the act here considered binding future legislation. A Legislature may not commit a future Legislature to the collection of certain revenues, but I cannot escape the conclusion that if there should be a default in the revenue bonds issued to pay for the project at Winfield and the constitutional Road Fund has been depleted or spent, there would be an irresistible demand to replace money in the Road Fund derived from general taxation so as to meet the pledge authorized in this proceeding.
It has been a public policy of this State to meet its bonds and obligations, and any *913 informed citizen of this State who knows of the financial dealings of this State can assert a pardonable pride in the financial solvency of the State and of the desirability of its bonds and obligations.
As I have pointed out, I think that this is another attack upon the pay-as-you-go theory, tending to destroy the existing solvency of this State. I would therefore hold that Chapter 117, Acts of the Legislature, 1949, violates Article X, Section 4, of the Constitution of this State and would deny the writ.