[No. 35385. *En Banc.* April 15, 1960.]

THE STATE OF WASHINGTON, *on the Relation of Washington Toll Bridge Authority, Plaintiff*, v. CLIFF YELLE, *as State Auditor, Respondent,* R. G. CLARK *et al., Intervenors.*[1]

[1]Reported in 351 P. (2d) 493.

*The Attorney General, Weter, Roberts & Shefelman* and *Harold S. Shefelman, Special Assistants, John S. Robinson* and *Stanton P. Sender, Assistants,* and *Charles O. Carroll* and *K. G. Smiles,* for plaintiff and intervenor.

*The Attorney General, Robert F. Hauth* and *Robert J. Doran, Assistants,* for respondent.

*Chadwick, Chadwick & Mills (Stephen F. Chadwick, Jr.,* of counsel), and *Grosscup, Ambler, Stephan & Miller (Slade Gorton,* of counsel), for intervenors Clark *et al.*

*John D. Spellman, amicus curiae.*

FOSTER, J.—Again the State Toll Bridge Authority seeks our mandate to compel the State Auditor to sign the bonds for the construction of a second Lake Washington toll bridge. In the prior case, *State ex rel. Washington Toll Bridge Authority v. Yelle*, 54 Wn. (2d) 545, 342 P. (2d) 588, only the supplemental appropriation act, Laws of 1959, Ex. Ses., chapter 11, p. 1700, was considered.[2]

We are presently concerned with Laws of 1959, chapter 162, p. 762, which reads as follows:

"Section 1. Section 12, chapter 173, Laws of 1937 as last amended by section 1, chapter 166, Laws of 1955 and RCW 47.56.250 are each amended to read as follows:

"Whenever a proposed toll bridge, toll road, toll tunnel or any other toll facility of any sort is to be constructed, any city, county or other political subdivision located in relation to such facility so as to benefit directly or indirectly thereby, may, either jointly or separately, at the request of the Washington state highway commission or the authority advance or contribute money, or bonds, rights of way, labor, materials, and other property toward the expense of building the toll facility, and for preliminary surveys and the preparation of plans and estimates of cost therefor and other preliminary expenses. Any such city, county, or other political subdivision may, either jointly or separately, at the request of the commission or the authority advance or contribute money or bonds for the purpose of guaranteeing the payment of interest or principal on the bonds issued by the authority to finance the toll facility. Appropriations for such purposes may be made from any funds available, including county road funds received from or credited by the state, or funds obtained by excess tax levies made pursuant to law or the issuance of general obligation bonds for this purpose. General obligation bonds issued by a city, county, or political subdivision may with the consent of the state highway

---

[2]The pertinent portion of the supplemental appropriation act of 1959 (Laws of 1959, Ex. Ses., chapter 11, p. 1700), is set out in full in *State ex rel. Washington Toll Bridge Authority v. Yelle*, 54 Wn. (2d) 545, 548, 342 P. (2d) 588.

It appropriated $100,000 from the motor vehicle fund and authorized the toll bridge authority to pledge that sum to guarantee the payment of the bonds. It further authorized the toll bridge authority to guarantee the bonds to the extent of $750,000 per annum and pledged succeeding legislatures to continue such appropriations.

commission or the authority be placed with the Washington toll bridge authority to be sold by the authority to provide funds for such purpose. Money, or bonds or property so advanced or contributed may be immediately transferred or delivered to the authority to be used for the purpose for which contribution was made. The authority may enter into an agreement with a city, county, or other political subdivision to repay any money, or bonds or the value of a right of way, labor, materials, or other property so advanced or contributed. The authority may make such repayment to a city, county or other political subdivision and reimburse the state for any expenditures made by it in connection with the toll facility out of tolls and other revenues for the use of the toll facility."

On the previous application, the mandate was refused because the statutory provisions authorizing the pledging of tax revenues to guarantee the payment of principal and interest on toll bridge bonds could not constitutionally be incorporated in the supplemental appropriation act of 1959. The constitutional barrier[3] which was the primary basis of that opinion is not present here; nor is the other constitutional barrier[4] there relied on controlling here. We emphasized the attempted amendment by the supplemental appropriation act of 1959 of that portion of Laws of 1957, chapter 266, § 2, p. 1037, which provided that the bonds " . . . shall be payable both principal and interest solely from the tolls and revenues derived from the operation of said toll facility. . . ."

The plaintiff here makes an impressive argument that we construed the quoted language too literally, and that it was intended to do no more than prevent the pledging of the state's general credit. However, even if we give the language a literal construction, there can be no question that the legislature can change its intention if such change be constitutionally expressed.

---

[3] "No bill shall embrace more than one subject, and that shall be expressed in the title." Washington constitution, Art. II, § 19.

[4] "No act shall ever be revised or amended by mere reference to its title, but the act revised or the section amended shall be set forth at full length." Washington constitution, Art. II, § 37.

■ Laws of 1959, chapter 162, p. 762, manifests a plain legislative intent that it shall apply to all toll bridges. It is a complete, independent act which does not purport to amend Laws of 1957, chapter 266, § 2, p. 1037. Under such circumstances, the constitutional provision (Washington constitution, Art. II, § 37) requiring an amended statute to be set out in full does not apply even if prior inconsistent statutes are impliedly repealed. *State ex rel. Port of Seattle v. Department of Public Service,* 1 Wn. (2d) 102, 95 P. (2d) 1007; *Opportunity Township v. Kingsland,* 194 Wash. 229, 77 P. (2d) 793; *State ex rel. Hansen v. Salter,* 190 Wash. 703, 70 P. (2d) 1056; *Spokane Grain & Fuel Co. v. Lyttaker,* 59 Wash. 76, 109 Pac. 316.

In the course of our previous opinion, we said:

"This does not mean that the bridge across Lake Washington need be delayed. It is clear that chapter 266, Laws of 1957, gives requisite authority to proceed. . . ." *State ex rel. Washington Toll Bridge Authority v. Yelle,* 54 Wn. (2d) 545, 555, 342 P. (2d) 588.

■ Respondent's contention that the invalid provisions of the 1959 Supplemental Appropriation Act constitute the only legislative action authorizing the guaranty of the bridge bonds is untenable. That statute contemplated state guaranty of the bridge bonds, while Laws of 1959, chapter 162, p. 762, authorizes cities, counties, or other political subdivisions benefited by toll facilities to make advances and contributions toward the expense of building toll facilities, or for the purpose of guaranteeing the interest or principal on the bonds issued by the toll bridge authority. The two statutes are not in conflict and neither excludes the operation of the other. One deals with a particular toll bridge; the other deals with all toll facilities, including the particular toll bridge.

Here there is no question of statutory construction. The legislative intent to empower cities, counties, and other political subdivisions benefited by a proposed toll facility to guarantee "the payment of interest or principal on the bonds issued by the authority" to finance that toll facility is clearly and unmistakably stated.

It is a matter of common knowledge that the single bridge across Lake Washington is inadequate for the present traffic and that, because of the rapid expansion of population in the territory east of Lake Washington, the problem is growing daily. This the court knows judicially;[5] likewise, it was known to the legislature and resulted in the enactment of Laws of 1957, chapter 266, p. 1037, authorizing the construction of a second Lake Washington bridge.

The first section of that act is:

"The Washington toll bridge authority is hereby authorized and directed to make all surveys necessary, design, and construct an additional bridge, including approaches adequate to carry a free flow of traffic thereto, across Lake Washington at a site in the vicinity of Union Bay and Evergreen Point or at such other location across Lake Washington which is deemed feasible by the authority." Laws of 1957, chapter 266, § 1, p. 1037.

See the consequent proposal on the location map which follows.

Because of the tremendous cost of such a facility and because of the history of successful use elsewhere, the legislature determined to finance such construction by bonds to be paid by toll revenues.

We are told, however, that as a matter of practical financing, the bonds cannot be sold if toll revenues alone are available for repayment, but that, to assure marketability, there must be some positive guaranty of payment in the event of a deficiency. To meet this exigency, the King county board of commissioners, by resolution[6] dated No-

---

[5] See Appellate Courts Use of Facts Outside of the Record by Resort to Judicial Notice and Independent Investigation, 1960 Wis. L. Rev. (No. 1) 39.

[6] "The parties understand that the moneys to be deposited, advanced or contributed by the County as provided in paragraphs 2, 4 and 6 above shall be derived from the share of moneys allocated to King County Road District No. 3 within the King County Road Fund. No funds accruing to the County Road Fund arising from any levy in any road district shall be used for this purpose. During the life of the agreement, the County agrees to allocate to King County Road District No. 3 fifty per cent (50%) of each credit to the County from the state motor vehicle fund."

vember 9, 1959, undertook for that purpose beginning in January, 1962, to deposit with the state treasury $700,000 annually for a period of thirteen years and $500,000 annually for seven years thereafter, a twenty-year total of $9,000,000, all payable solely from the share of King county road district No. 3 of the state's contribution from the motor vehicle fund to the county road fund. But this does not mean that King county must pay the full amount of the guaranty because the obligation is only to provide money as needed within the limits designated. It is possible that it may never exceed $700,000. That deposit is required in 1962, and the county is obliged to replenish the fund each year to keep it at that level for a thirteen-year period, and at a level of $500,000 for the remainder of the term. The county may, however, be obliged to deposit $700,000 annually for a period of thirteen years and $500,000 annually for the remainder of the term if needed, or it may be in a lesser sum, down to zero, depending upon the drain on the guaranty fund. In other words, the difference between the initial deposit of $700,000 and the total amount of the guaranty is only a contingent liability. All moneys advanced pursuant to this guaranty must be repaid upon retirement of the bonds. The resolution specifically excludes use of any moneys of the county road fund arising from any levy. Because of the pledge of the road district revenues allocated to King county road district No. 3 for a period of years, respondent contends that such exceeds the powers of the county commissioners and is void.

It is argued that Laws of 1959, chapter 162, p. 762, does not authorize the present pledge of future contributions, but authorizes only present contributions. It is a matter of common knowledge that revenues in any annual or biennial period will be inadequate to pay the tremendous cost of the bridge, and that, consequently, such revenue bonds must be retired over a long period of time. The legislature was aware that any guaranty of the principal and interest of bonds for a proposed toll facility would be a continuing liability. We will not impute an intent of the legislature

to make impossible that which it had expressly authorized the counties to do.

Such similarly dispels respondent's contention that, absent specific legislative enactment, the present county commission cannot bind succeeding commissions respecting future utilization of state contributions to that portion of the county road fund allocated to road district No. 3.

■ Respondent and intervenors advance a variety of objections based upon the county budget statute, but we find them devoid of merit. The contention is made that, because there is no appropriation covering the county's contribution in the 1959 budget, the county's proposed contribution is in violation of the budget law, RCW 36.40.100 to RCW 36.40-.130, and, further, that an obligation is incurred by the county road fund which is beyond the road fund limit set in RCW 36.40.110.

The basic fallacy of these arguments is that the county is not to make any contribution prior to January, 1962, for which year the contribution will not be the whole $9,000,000, which is to be spread over a period of twenty years, but only $700,000. It would be utterly impossible to have budgeted any 1962 expenditure in the 1959 budget.

■ Counsel for the respondent and the intervenors misconceive the effect of budget laws. The purpose was very clearly explained by the supreme court of Arizona in *Bank of Lowell v. Cox,* 35 Ariz. 403, 279 Pac. 257, in the following words:

" . . . These laws varied in form, but the fundamental purpose was the same—to put county affairs on a cash basis and then to maintain them so by prohibiting the incurring of any indebtedness in any fiscal year, unless funds had been first provided to meet it. . . ."

On the other hand, counsel rely upon a group of cases applying debt limitation provisions of constitutions or statutes, as follows: *City of Indianapolis v. Wann,* 144 Ind. 175, 42 N. E. 901 (1895); *Niles Water Works v. Mayor of Niles,* 59 Mich. 311, 26 N. W. 525 (1886); *Wallace v. Mayor of San Jose,* 29 Cal. 181 (1865); *San Francisco Gas Co. v. Brickwedel,* 62 Cal. 641 (1882); *Public Market Co. of Portland v.*

*City of Portland,* 171 Ore. 522, 130 P. (2d) 624 (1943). With the exception of the Oregon case, they were all decided before the turn of the century.

 The budget law, on the other hand, is not a debt limitation act, but, even under such laws, bonds to be paid out of special funds are excluded. This state was one of the first to adopt such a rule. *Winston v. Spokane,* 12 Wash. 524, 41 Pac. 888, is significant because it was written by Chief Justice Hoyt, who, only six years before, had been president of the constitutional convention. Other cases are *State ex rel. Capitol Committee v. Clausen,* 134 Wash. 196, 235 Pac. 364, and *Ajax v. Gregory,* 177 Wash. 465, 32 P. (2d) 560.

 We find the proper rule of law announced by the supreme court of Utah in *Utah Power & Light Co. v. Ogden City,* 95 Utah 161, 79 P. (2d) 61 (1938), as follows:

"The objections that the city did not . . . budget the outlay in its annual budget do not lie in the case of a proceeding under the special fund doctrine where resort may be had only to revenues of the proposed plant and not to general revenues of the City."

More recently, the supreme court of West Virginia in *State ex rel. State Road Commission v. O'Brien,* 140 W. Va. 114, 82 S. E. (2d) 903 (1954), was concerned with whether toll bridge revenue bonds, for which the primary security for payment was limited to the tolls themselves, might be guaranteed by the road fund if the primary source should prove inadequate. The argument was that such a guaranty from the West Virginia state road fund was a debt prohibited by the constitution. After a painstaking review of many cases from many states, including our own *Ajax v. Gregory, supra,* that court concluded:

"It would appear that the courts of other jurisdictions are unanimous in holding that a constitutional fund may be pledged to the payment of revenue bonds without violating debt provisions of their Constitutions, similar to those contained in Article X, Section 4, of the Constitution of this State."

Like Washington,[7] West Virginia has a constitutional provision limiting the use of the motor vehicle fund to highway purposes. In explaining why the guaranty of such bonds from the motor vehicle fund did not constitute a debt within the constitutional debt limitation, that court said:

" . . . In other words, the moneys which go into this fund do not constitute a part of the general revenues of the State, since they can not be used for general purposes, but only for the purposes specified in the Amendment. The State Road Commission and the Governor, together, have the authority to take from the State Road Fund sufficient funds, if they are available, to build a bridge at Winfield. They also have the authority to pay one-half of the cost of the project out of the fund and accept the other one-half from the Federal Government. In either case, the funds supplied by the State would come out of the State Road Fund. The administrators of this Fund have the authority to, and responsibility for, providing a bridge at this place to facilitate travel in this industrial and agricultural area, and under the plan proposed for the financing of its construction, by which the Federal Government furnishes one-half of the funds therefor, and revenue bonds are to be sold to provide the other half, they *may* do so without any cost to the Fund, inasmuch as its liability for securing the bonds is secondary. If payments in the future *are* required to be made from the Fund, upon its secondary contingent liability, it will be for a purpose for which the Fund was created, and for a project as deserving and necessary as any other for which its funds might be expended. If the additional contingent security is not given, the bonds may not be sold—the bridge may not be built—or, if sold, the premiums and higher interest rate would be additional burdens placed upon those interested in the enterprise. Of course, neither the great need for the improvement, nor the financial attractiveness to the taxpayers, would validate the proposal if it created a debt within the meaning of Article X, Section 4, of the Constitution. This Court holds that it does not. The resolution providing for the issuance of these bonds, and the words contained in them, make it clear to all who purchase them, that they are not general obligations of the State of West Virginia, and do not pledge the full faith and credit of this

[7]Recently construed by us in *Automobile Club of Washington v. Seattle*, 55 Wn. (2d) 161, 346 P. (2d) 695.

State. This is a pledge of funds in a constitutional fund, established by the people of this State for the purpose for which the pledge is made. This action does not bind any future Legislature to impose new, or continue present, taxes which, by the Constitutional Amendment, must go into this Fund. The Legislature may continue such taxes at the present rate, it may raise them, or it may abolish all taxes that are directed into this Fund. There is no contractural assurance that sufficient funds will be available in the State Road Fund to pay the principal or interest on the bonds in question in case it becomes necessary to do so. There is the practical assurance, however, that the automobile is here to stay, and so are taxes."

In the instant case, the moneys pledged from the county road fund are not even a general obligation of that fund. The amount pledged is to come solely from the state contribution to the county road fund from the motor vehicle fund; road fund moneys arising from any levy are specifically excluded from use. For this second reason, also, it is certain that the county budget law appropriation provision does not apply, nor is the budget law limitation on obligations incurred by the road fund applicable.

We find nothing in the county budget statutes that in any wise impairs King county's power to guarantee the payment of the principal and interest on the bonds at a maximum rate of $700,000 per annum for a period of thirteen years and a reduced amount thereafter with a maximum of $9,000,000. It should be remembered that such advances will be repaid upon retirement of the bonds.

Respondent and intervenors argue that §§ 21 and 22 of the toll bridge authority resolution No. 341 violate RCW 47.56.220 and RCW 47.56.284, and are unauthorized.

Section 21[8] declares that RCW 47.56.220, made part of the

---

[8]"*Section 21.* The provisions of RCW 47.56.220 as now enacted relating to limitations on competing bridges are hereby made a part of this Resolution, and under such law the provisions thereof are deemed to constitute a contract for the benefit of the holders of the Bonds. In the event that the Legislature of the State of Washington shall hereafter enact valid legislation authorizing the construction of a toll-free additional bridge across Lake Washington by any public agency while any Bonds are outstanding, the construction of such bridge shall not be deemed a violation of the covenants of this Resolution or of the

resolution, constitutes a contract for the benefit of the holders of the bonds,[9] and that, if the legislature should subsequently authorize a toll-free bridge across Lake Washington before all of the bonds are retired, the construction of such toll-free bridge should not be deemed a violation of the resolution if there should be on file a report from a qualified engineering firm, experienced in traffic analysis, that the tolls and other revenues are sufficient to pay the bonds, and if the legislature shall provide funds to meet any deficiency.

In the resolution of the toll bridge authority before the court in *State ex rel. Toll Bridge Authority v. Yelle, supra,* the comparable section prohibited the construction of a toll-free bridge if any of the bonds remained unpaid unless certain conditions existed. Additional restrictions were imposed above the legislative direction. In respect of that provision, we said:

" . . . It is obvious that the Toll Bridge Authority cannot, by resolution, take a position in conflict with the terms

contract with the holders of the Bonds if the following conditions shall be met and complied with prior to the construction of such additional toll-free bridge, to wit:

"(1) There shall be on file with the Secretary of the Authority an engineering report from a nationally recognized consulting engineering firm, or firms, experienced in traffic analysis, to the effect that in their opinion the net tolls and other revenues to be collected from the second Lake Washington bridge after the construction of such additional bridge will be sufficient to meet the minimum annual debt service requirements for the Bonds; and

"(2) The Legislature of the State of Washington shall pass appropriate legislation pledging, so long as any of the Bonds are outstanding, sufficient funds necessary to meet any deficiency in the minimum annual debt service requirements for the Bonds, created by the diversion of traffic from the second Lake Washington bridge and the diminution of revenue therefrom resulting from the construction of such toll-free facility."

[9]Existing law is a part of every contract (*Fischler v. Nicklin,* 51 Wn. (2d) 518, 319 P. (2d) 1098; *Dopps v. Alderman,* 12 Wn. (2d) 268, 121 P. (2d) 388; *L. J. Dowell, Inc. v. United Pac. Cas. Ins. Co.,* 191 Wash. 666, 72 P. (2d) 296; *In re Kane,* 181 Wash. 407, 43 P. (2d) 619), and, consequently, this provision may be disregarded as surplusage except to the extent that the explicit inclusion of the statute, and the emphasis on a certain part thereof, is an indication of the intent of the framers of § 21 of the resolution.

and conditions imposed upon the authority by the Laws of 1957, chapter 266, which authorized the construction of the bridge with which we are here concerned, . . . "

Respondent's argument against present § 21 is, in substance, that the Toll Bridge Authority has undertaken to bargain away the legislative power of the state and that the paragraph under consideration is *ultra vires* and void. The plaintiff, on the other hand, argues that the respondent misconceives the effect of the challenged paragraph and concedes that the Toll Bridge Authority cannot bargain away the state's legislative power, but that the change in the resolution presently before us from the one previously considered was designed specifically to overcome this objection. Plaintiff argues that this is not a dictation to the legislature but that, by RCW 47.56.220, the legislature has limited its own power to authorize an additional bridge, and that under the resolution the bondholders agree to waive any claim of violation of RCW 47.56.220 if the conditions specified in the resolution are met. We agree with the plaintiff's argument that § 21 is not a limitation upon the right of the state to construct an additional toll-free bridge, but, on the other hand, is a waiver by the bondholders of the right to object to an additional toll-free bridge if the specified conditions which in accord with the purpose of RCW 47.56.220, contemplate financial security to the bondholders are complied with. Such is the bondholders' privilege because RCW 47-.56.220 is specifically for their benefit.

Respondent urges that § 22[10] is an unlawful restric-

---

[10] "*Section 22.* Under the provisions of RCW 47.56.284, the Authority may authorize the construction of additional toll bridges across Lake Washington at such times as traffic may warrant and at such sites as deemed feasible. The Authority hereby determines and covenants that traffic shall not be deemed to warrant such additional toll bridge unless the following conditions shall be met and complied with at the time of the construction of such additional toll bridge, to wit:

"(1) There shall be on file with the Secretary of the Authority a certificate by the accountant for the Authority to the effect that the annual average of net tolls and other revenues collected from the operation of the second Lake Washington bridge as a toll facility, during any consecutive 24-month period out of the immediately preceding 36-

tion upon the Toll Bridge Authority to construct additional toll bridges.

It recognizes, by RCW 47.56.284,[11] that the state may construct additional toll bridges across Lake Washington *"at such times as traffic may warrant and at sites as deemed feasible."* (Italics ours.) The resolution determines that an additional toll bridge shall not be deemed warranted by traffic unless the accounting certificate on file with the authority shall disclose revenues from the second Lake Washington bridge for a consecutive twenty-four-month period out of a preceding thirty-six-month period equal to twice the amount of the bond requirements, and that an engineering certificate be on file showing that, after possible diversion of traffic from the second bridge to an additional one, such revenues shall equal 125% of the average annual interest and principal requirements of the bonds and that,

---

month period equal at least two times the average annual debt service requirements for the Bonds; and

"(2) There shall be on file with the Secretary of the Authority an engineering report from a nationally recognized consulting engineering firm, or firms, experienced in traffic analysis, to the effect that in their opinion after giving effect to any possible diversion of traffic from the second Lake Washington bridge to such additional toll bridge, the net tolls and other revenues to be collected from the second Lake Washington bridge, so long as any Bonds shall be outstanding, will be equal to at least 1.25 times the average annual interest and principal requirements on the Bonds.

"In the event that the foregoing certificates cannot be obtained, or as an alternative, such additional toll bridge may be constructed if the Legislature of the State of Washington shall pass appropriate legislation pledging sufficient funds necessary to meet any deficiency in the minimum annual debt service requirements for the Bonds, created by the diversion of traffic from the second Lake Washington bridge and the diminution of revenue therefrom resulting from the construction of such toll facility, or sufficient funds for such purpose are made available from some other lawful source, so long as any of the Bonds are outstanding."

[11]"The existing Lake Washington bridge, the toll bridge authorized herein, and any other bridge hereafter constructed across Lake Washington, are hereby construed and designated as a continuous project within the terms and provisions of RCW 47.56.070; and notwithstanding the provisions of RCW 47.56.220, the authority may authorize additional toll bridges across Lake Washington at such times as traffic may warrant and at such sites as deemed feasible." RCW 47.56.284.

if such certificates cannot be obtained, the legislature shall guarantee any deficiency necessary for the retirement of the bonds before constructing an additional toll bridge.

The respondent's argument that § 22 of the resolution is void is substantially that the conditions set forth therein are unrelated to the touchstone of judgment imposed on the authority by RCW 47.56.284, and constitute extra requirements that must be met, and, as such, the resolution attempts to limit the future discretion of the Toll Bridge Authority in constructing an additional toll bridge. Plaintiff, on the other hand, argues that § 22 contemplates the exercise of a reasonable discretion by the Toll Bridge Authority, based upon then prevailing circumstances as opposed to an arbitrary decision disregarding existing circumstances.

We agree with plaintiff. By RCW 47.56.284, permission is given to the authority to authorize construction of an additional toll bridge. Therein, the legislature sets forth two yardsticks to be considered by the authority in deciding whether to authorize construction. The authority is not required to authorize construction when such criteria have been considered favorably. It may take into consideration other relevant expressions of legislative intention. Thus, RCW 47.56.284 is not exclusive, and must be read together with, and in the light of, the legislative philosophy as to bondholder security expressed in RCW 47.56.220 and RCW 47.56.060. The latter statute specifically empowers the authority to covenant and make agreements to safeguard the revenue of such undertakings as the second Lake Washington bridge.

Thus, although one obvious purpose of the criterion respecting whether "traffic may warrant" additional construction is a consideration of the actual physical need of a new bridge facility, another purpose, in accord with the general intention of the legislature expressed in the toll bridge acts, and to which § 22 is addressed, is to afford security to bondholders.

It is quite plausible that, while the actual physical needs of traffic may warrant another bridge, the amount of traffic

may, none the less, not afford sufficient revenue to pay for both bridges. Thus, as measured by the revenues derived from operation of the second Lake Washington bridge, the traffic would not financially warrant the construction although physically so warranting.

Further, in accord both with the criterion set forth in RCW 47.56.284, and the legislative intent to secure bondholders, § 22 covenants that the authorization for an additional bridge will be granted only when the traffic on the second bridge is sufficient to produce revenues which will sufficiently secure the bonds; traffic then would warrant additional construction.

The resolution therefore accords with the legislative purpose of maintaining the bondholders' security by stating that the traffic shall not be deemed to warrant additional construction unless there is assurance (by compliance with the stated conditions) that traffic financially warrants construction.

Such is eminently proper and in conformance with the express statutory grant of authority to the Toll Bridge Authority. Rather than unduly restricting future action of the authority, the resolution sets forth standards to be used in soundly conforming to the criteria imposed by RCW 47.56-.284, which, indeed, contemplates that the decision to construct shall be based upon sound judgment and not arbitrarily arrived at in defiance of then existing conditions.

 The argument is made that the construction of a second toll bridge across Lake Washington is not a county purpose within the first proviso of the twenty-seventh amendment to the state constitution, which is as follows:

*"Provided,* That no part of the indebtedness allowed in this section shall be incurred for any purpose other than strictly county, city, town, school district, or other municipal purposes . . . "

The resolution identifies at least ten county purposes. They are accurately summarized in plaintiff's brief as follows:

"(1) the inconvenience and danger to county citizens of the present single crossing; (2) the retardation of develop-

ment of the north district by reason of the single crossing; (3) the decrease in traffic hazards which the proposed bridge will bring about; (4) the improvement to the county road system resulting from the approaches to the proposed bridge; (5) the raising of the tax base and stimulation of business and residential growth which will be a consequence of the proposed bridge; (6) the improved access between downtown Seattle and the northeast shore of the lake which the proposed bridge will facilitate; (7) the development of the Stevens Pass area which the proposed bridge will hasten, to the benefit of north King County; (8) the implementation of the county's road plan by the proposed bridge; (9) the integration of the proposed bridge (and therefore the county roads on the east side of the lake) with the Seattle-Tacoma-Everett freeway and the Seattle street system; and (10) the fact that the proposed bridge is the only proposed program which can solve the problems of the lake crossing without several years' delay."

The county purpose of a second toll bridge across Lake Washington is well within the limitations in our decided cases on this subject. *Grant v. Evans*, 163 Wash. 484, 1 P. (2d) 852.

The argument is made that there is a loan of the county's credit and that this is prohibited by Art. VIII, § 7 of the state constitution, which is as follows:

"No county, city, town or other municipal corporation, shall hereafter give any money, or property, or loan its money, or credit to or in aid of any individual, association, company or corporation, except for the necessary support of the poor and infirm, or become directly or indirectly the owner of any stock in or bonds of any association, company or corporation."

The prohibition contained in the quoted constitutional provision applies only to loans to private agencies and has no application to a loan of credit to a state agency. *Rands v. Clarke County*, 79 Wash. 152, 139 Pac. 1090.

A further objection is that Laws of 1957, chapter 266, § 1, p. 1037, is devoid of standards to guide the Toll Bridge Authority in a selection of a site for the bridge. The section is as follows:

"The Washington toll bridge authority is hereby authorized and directed to make all surveys necessary, design, and

construct an additional bridge, including approaches adequate to carry a free flow of traffic thereto, across Lake Washington at a site in the vicinity of Union Bay and Evergreen Point or at such other location across Lake Washington which is deemed feasible by the authority."

While it is beyond question that the legislature, in delegating power to an administrative agency, must provide standards for the guidance of the agency, we find no room for the application of that principle here for the very plain reason that the administrative agency has selected the precise site designated by the legislature for the location of the bridge. This is abundantly clear from the preceding diagram. The legislature selected the site in the vicinity of Union Bay and Evergreen Point. That is precisely where the authority has located the bridge. Only in the event that the authority selected some other location for the bridge could the language delegating authority be involved. We have already determined in *State ex rel. Toll Bridge Authority v. Yelle, supra,* that the legislature has authorized the construction of the bridge.

The writ will issue.

WEAVER, C. J., HILL, FINLEY, ROSELLINI, OTT, and HUNTER, JJ., concur.

DONWORTH, J., concurs in the result.

MALLERY, J. (concurring in the result)—The instant majority opinion is irreconcilable with *State ex rel. Washington Toll Bridge Authority v. Yelle,* 54 Wn. (2d) 545, 342 P. (2d) 588 (hereinafter referred to as the Toll Bridge case), which prohibited the *state highway commission* from guaranteeing payment to toll bridge bonds out of the *state motor vehicle fund.*

The majority opinion in the instant case permits the *King county commissioners* to guarantee payment of the toll bridge bonds *out of the state motor vehicle fund.*

This is not a case where the King county commissioners have greater power over the motor vehicle fund than the state highway commission has, so that only they can guarantee the toll bridge bonds. This is abundantly clear from

the original Washington State Toll Bridge Authority Act (Laws of 1937, chapter 173, p. 654) which provided, *inter alia* [p. 659]:

". . . *The Washington Toll Bridge Authority* is empowered to receive and accept funds from the State of Washington or the Federal government upon a cooperative or other basis for the construction of any toll bridge authorized under this act and *is empowered to enter into such agreements with the State of Washington* or the Federal government *as may be required for the securing of such funds.*" (Italics mine.)

This was pointed out in the dissent to the Toll Bridge case, *supra*, in these words [p. 680]:

". . . In short, if any moneys are paid out of the Motor Vehicle Fund, they will constitute loans to the Toll Bridge Authority and will be repayable out of tolls. This course of action, as contemplated by the Supplemental Appropriation Bill, *is in full accord with the existing powers of the Toll Bridge Authority and the State Highway Commission.*" (Italics mine.)

There is no justification for an undeclared judicial change of heart which produces unnecessary confusion in the law. The Toll Bridge case should be openly overruled. That the instant case does so *sub silentio* necessarily follows from these facts.

The concluding paragraph of the Toll Bridge case, *supra*, contains the ruling of the case [p. 677]:

"This does not mean that the bridge across Lake Washington need be delayed. It is clear that chapter 266, Laws of 1957, gives requisite authority to proceed. The seven hundred fifty thousand dollars a year, which counsel say would probably never be used, falls far short of being sufficient to guarantee even the annual interest on thirty million dollars worth of bonds; but it is an entering wedge. If the court were to approve the method used here to make a token guarantee *from tax sources* of what are *supposedly revenue bonds*, it would afford the precedent for *complete guarantees from tax sources* by a similar procedure." (Italics mine.)

This ruling that tax sources cannot guarantee revenue bonds is precise and unequivocal. It is predicated upon this reasoning in that opinion [p. 675]:

" . . . the Laws of 1957, chapter 266, § 2, which states that the revenue bonds which the Toll Bridge Authority may issue for the second Lake Washington toll bridge *shall be payable both principal and interest solely from the tolls* and revenues derived from the operation of said toll facility.'

"The 1957 law does more than restrict the power of the Toll Bridge Authority; it restricts the sources available for payment on the bonds. . . ." (Italics mine.)

The Toll Bridge case then proceeds to confuse a guarantee with the ultimate payment of the bonds. The reasoning which produced this erroneous ruling is contained in this paragraph of the opinion [p. 675]:

"We do not regard it as material that any amounts taken from the Motor Vehicle Fund to pay principal and interest on the bonds will ultimately be repaid from tolls and revenues of the bridge. Moneys of the Motor Vehicle Fund are being made available to guarantee prompt payment of principal and interest on these bonds, and this constitutes a provision substantially at variance with the restriction on the source of payment which is a part of the 1957 act."

This holding that a *guarantee* and an ultimate *payment* are legally the exact equivalent of each other must be overruled if any tax source is to be used to guarantee the toll bridge bonds. The fact is, they are not the same. When the ultimate payment of the bonds is made out of tolls, the effect of the guarantee is spent. It thus ceases to exist without any depletion of the motor vehicle fund, since any payments out of it would have been only loans, which had been repaid out of tolls. The Toll Bridge case, *supra*, refuses to recognize the terminal status of the motor vehicle fund when it says [p. 675]:

"We do not regard it as material that any amounts taken from the Motor Vehicle Fund to pay principal and interest on the bonds will ultimately be repaid from tolls . . ."

The total ultimate payment out of tolls is not merely *material*, it is determinative of the source of the bond payments. An expired guarantee does not constitute a payment of the bonds, the Toll Bridge case to the contrary notwithstanding.

Having pointed out the specific points of irreconcilability between the cases, it remains only to be said that the Toll Bridge case, *supra*, is no longer the law.

I concur only in the result of the majority opinion.